David H. KROHN and the Colorado National Bank of Denver, as Co-Executors of the Estate of Maurice J. Krohn a/k/a M. J. Krohn, deceased, Plaintiffs,

v.

UNITED STATES of America, Defendant.

Civ. A. No. 8583.

United States District Court
D. Colorado.

Oct. 12, 1965.

Holland & Hart, J. W. Tracey, Jr., William J. Carney, Jr., and Simon Quiat, Denver, Colo., for plaintiffs.

Lawrence M. Henry, U. S. Atty. for Dist. of Colorado, Denver, Colo., and John H. Bray, Tax Div., Dept. of Justice, Washington, D. C., for the United States.

WILLIAM E. DOYLE, Judge.

This is an action which seeks to recover a refund of federal estate taxes which were paid following the disallowance of a claimed charitable deduction in connection with a bequest to the Denver Medical Society. The validity of the disallowance is in issue. The amount of the refund sought by plaintiff is $40,-354.27. The case was tried to the Court, briefs were submitted and oral arguments have been made. The matter now stands submitted. Formal findings of fact and conclusions of law are dispensed with and statement of facts and the other conclusions of fact which appear in this opinion will serve as findings of fact. The legal conclusions of the Court will sufficiently set forth the conclusions of law which result from the findings.

Maurice J. Krohn, the decedent, died testate on December 26, 1958. In his will he created a trust providing certain charitable bequests amounting to $572,011.32. The recipients of the gifts were the Mile High United Fund of Denver, General Rose Memorial Hospital of Denver, The Temple Emanuel Congregation of Denver, and the Denver Medical Society. In the tax return filed by the executors the entire amount of the trust, including the share of the Denver Medical Society, was claimed as a charitable deduction. The claimed deduction was disallowed in connection with the gift to the Denver Medical Society on the ground that the Society did not qualify as an exempt organization within the terms of Section 2055 of the Internal Revenue Code of 1954, Title 26 U.S.C.A. § 2055. The amount of the deficiency was fixed at $40,062.56, but following further assessment for interest and resultant adjustments, the total amount in issue is $40,354.27.

Section 2055 of the Internal Revenue Code reads as follows:

"(a) *In General.*—For purposes of the tax imposed by section 2001, the value of the taxable estate shall be determined by deducting from the value of the gross estate the amount of all bequests, legacies, devises, or transfers (including the interest which falls into any such bequest, legacy, devise, or transfer as a result of an irrevocable disclaimer of a bequest, legacy, devise, transfer, or power, if the disclaimer is made before the date prescribed for the filing of the estate tax return)

\* \* \* \* \* \*

"(2) to or for the use of any corporation organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes, including the encouragement of art and the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private stockholder or individual, and no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation; \* \* \* ."

The standards set out in the statute call upon us to determine whether, in the light of the surrounding facts as to the organization and operation of the Denver Medical Society, it can be held to exist exclusively for religious, charitable, scientific, literary, or educational purposes, and whether no substantial part of its activities is carrying on propaganda or otherwise attempting to influence legislation. During the course of oral arguments counsel for the government has stated that the primary test relied upon is whether the Denver Medical Society is a corporation organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes. There is evidence as to activities of the Society having to do with the influencing of legislation and the "legislative activity" test comes into play in determining whether the legislative activities of the Society are insubstantial. The facts must be examined and tested in some detail in light of the statutory requirements.

Many of the facts as to the organization and operation of the Society are undisputed. A lengthy stipulation has been filed and is relied on by the plaintiff as showing that the many charitable activities of the Society virtually preempt the field so that when considered in relationship to the noncharitable activities the latter appear to be incidental.

The Denver Medical Society was formed as a nonprofit corporation in February, 1908. It is stated in its objects and purposes that it is formed:

" \* \* \* to include in one organization the reputable and legally qualified doctors of medicine of the City and County of Denver or of such other geographical or political areas as may be assigned to the jurisdiction of the Society by the Colorado Medical Society, to promote the science and art of medicine, the betterment of public health, and the unity, harmony, and welfare of the

medical profession, and, *together with other component societies, to maintain the Colorado Medical Society, and through it the American Medical Association."* [Emphasis supplied]

Membership in the Society is open to any qualified doctor of medicine who is a graduate of an American Medical Association-approved school and whose major office is within the City and County of Denver. Physicians outside the city may also become members consistent with the by-laws of the Colorado Medical Society and those of the American Medical Association. The Denver Society is chartered by the Colorado Medical Society and its constitution must be in accord with that of the State Society. Membership in the Colorado Society and in the American Medical Association may be obtained only through association with the Denver Medical Society. The structure of the Denver Society in relationship to the State and the national organizations is similar to many other like associations and organizations. Delegates from the Denver Society are elected to the state society, which in turn elects the delegates to the American Medical Association. The governing body of the Denver Society is the Council of Delegates, which is composed of the officers of the Society, together with the elected delegates and alternates to the Colorado State Medical Society. The Constitution states that the Council "shall exercise the delegated powers of the members of the Society as a whole and shall transact all general business of the Society not otherwise specifically provided for. * * *"

The by-laws delegate to the Board of Trustees powers with respect to the property and business affairs of the Society. In addition, there is a Board of Censors which has jurisdiction over membership, ethics and discipline.

There is very close integration between the Denver Society, the state society, and the American Medical Association. Communication is maintained through the delegates and representatives to State and national meetings and also through addresses of officers, committee reports and official publications of the organizations. Indeed, integration is so complete that it would appear the local group's functions are largely determined by decisions made at the State and national level.

The official activities of the Denver Medical Society are performed through committees, through the officers and the Council, and through the membership meetings. The numerous committees include the following: Policy, Referral Service, Library, Publicity, American Medical Education Foundation, Civic Affairs, Insurance, Legislative, Hospital Relations, and Public Health.

The official publication of the Society is the Denver Medical Bulletin. Both sides have cited various items from this bulletin as evidencing the activities of the Society.

The finances of the Society are held in a general fund and in a library endowment fund. This latter is kept on a strictly separate basis. Nevertheless, the Society is the trustee of this fund and administers it. The Society rents office space in the library building and pays rent to the Library Endowment Fund.

All expenses incurred by the Society are paid from the general fund. Dues to the three medical societies—County, State and national—are paid by a single check made out to the Denver Medical Society. The Denver Society in turn remits membership dues to the State Society and the American Medical Association out of the general fund.

The by-laws of the Society provide for regular scientific meetings in each odd numbered month except January, at which time the annual meeting is held. Officers are elected annually and the new president delivers his address at the annual meeting. The Council of Delegates meets in each even numbered month and are given authority to approve the proposals of the board of trustees concerning dues and the annual

budget. The board of trustees meets monthly. There are five elected trustees who, together with the President, Vice-President, President-Elect, Secretary and Treasurer, serve on the board.

Unquestionably, much of the activity of the Society qualifies as charitable. The library, for example, is clearly within the scope of the statutory definition. The operating and maintaining of the library are, of course, important activities of the Society. It contains many thousands of volumes and is highly valuable. It is open to all members of the State Society and members of the other states which receive the Rocky Mountain Medical Journal. It is also open to dentists, veterinarians, interns, residents, medical students, and certain members of the public. The Government does not dispute that the library is an educational effort within the meaning of the statute.

The regular scientific meetings are educational within the meaning of the statute, in that they often deal with strictly scientific subjects, and, on the other hand, are sometimes concerned with socio-economic subjects. Thus they do not overall contribute much to plaintiffs' thesis that the organization is exclusively charitable. Indeed, the scientific meetings are often concerned with matters which are of special personal interest to the group and to the individual members.

Like the regular scientific meetings, the bulletin is double-edged in that it contains some educational material, including announcements and notification of activities of interest to the medical profession, but also contains much other material, the value of which is personal to the individual doctors rather than to society as a whole. Frequently, for example, the officers expound political philosophy, discussing the status of legislative measures and urging the members to contact Congressmen in support of the medical profession's position with respect to particular legislation. Thus the bulletin, although it has educational and charitable aspects, cannot be placed

on the credit side in this public versus private-interest evaluation.

The Blue Shield-Blue Cross system is and has been of particular interest to the medical profession for the practical reason that doctors look to it in many instances for compensation under the Blue Shield Plan, but also because it is the medical profession's answer to the various legislative proposals before Congress often described as "Medicare" or "Socialized Medicine." While we recognize that support of Blue Shield and Blue Cross is a perfectly valid activity and is no doubt in the interest of the medical profession, the Denver Society as a group and the individual doctors; nevertheless, activity in its behalf to oppose Medicare legislation can scarcely be considered exclusively educational, charitable, or scientific.

There are many other activities of the Denver Medical Society which do fall within the statutory definition, such as the Society's support of medical education; its public health work, including its efforts in behalf of polio immunization; its work at the Denver General Hospital; and even its efforts to staff the hospital—all should be regarded as public and charitable.

The Denver Society has organized and maintains a doctor referral service. This activity is, of course, affected with a public interest. Here again, however, there is private benefit also to the participating doctors.

For a time the Society sponsored a telephone answering service. This is an activity which has to be classified as private rather than public.

There is a speakers' committee, the activities of which are both educational and thus charitable, but also noncharitable in that the speakers sometimes discuss nonscientific subjects.

The public relations efforts of the association, including the advertising in favor of legislative programs, the adoption of ground rules for the release of news, certainly is designed to benefit the group and the individuals.

Much of the Government's emphasis is placed on the alleged political activities of the Denver Medical Society. To be sure, there is a legislative committee which works with the State Society Legislative Committee, the members of which are at times also members of the State Society Legislative Committee. The committee studies measures that are before the State legislature and the members of the committee attend sessions and sometimes exert influence in connection with pending bills. At the committee meetings pending legislation and the result of legislative activity are considered. Most of the legislative activity of the Denver Society has to do with matters before the State legislature, such as the so-called "Good Samaritan" bill. On the national level the Denver Society has voiced interest in a variety of measures, such as the Kerr-Mills bill. It has been opposed to the King-Anderson Medicare measure. The members of the Society are often called upon to communicate with legislators and members of Congress. The committee has drafted formal resolutions and has forwarded these to the Congress in favor of or in opposition to certain pending legislation. Such a resolution opposing the proposed Forand bill was passed.

The State Society has had a paid lobbyist during the last few years (since 1963). It has also undertaken to make special assessments to conduct an educational program in connection with pending legislation. In addition there has been organized activity by the Ladies Auxiliary of the Denver Medical Society in connection with pending legislation which would affect physicians, or the group as a whole.

The State Society has sponsored a separate organization to directly intervene in politics. This is called "Compac." Its funds are derived from voluntary contributions by individual members of the State Society. While the evidence does not reveal the exact nature of the activity of this organization, it would appear that it contributes to political campaigns and participates through its members in the election of candidates favorable to its viewpoints. Counsel would have us isolate the County Society and not consider activities of the State Society or the American Medical Association in judging it, but it cannot be denied that the Denver Society cooperates not only with the State Medical Society, but with the American Medical Association in its efforts on behalf of or against legislation.

The above discussion does not exhaustively describe the activities of the Denver Medical Society, either public activities or those which have a private impact. They do serve to point up the kind and character of evidence which was adduced at the trial and it fairly presents a picture of the character of the Society.

█ It has been the position of counsel for plaintiff that we should judge the Denver Medical Society upon the basis of its activities covering the years 1957 and 1958 only, thus allowing a consideration of its activities for a period of time prior to the death of the decedent. There is no arbitrary limitation which is recognized by the cases and it may be that some of the evidence which has been received and considered is somewhat remote. However, it does not appear that the Society has changed radically during the period that it has been examined. Counsel for plaintiff has cited some officers' statements indicating that in the latter years there has been more emphasis upon political rather than scientific and educational activities. It is true that "Compac" was not formed until 1963, and that such organized political activities as the coffee cup and home town movements were not initiated until some time after the death of Dr. Krohn. It does not follow, however, that this evidence should be excluded from consideration. It has at least some probative value in determining whether the character of the Society was such that it should be entitled to recog-

nition under Section 2055 in the year in question.

▮ The first question is whether the term "exclusive" in the statute means that all of the activities of the Society must be educational, scientific or charitable in order for the organization to qualify for exemption pursuant to the applicable statutory definition. The plaintiffs cite many cases for the proposition that there should be no strict construction of the statute that bequests for public purposes contribute to good government in that they perform by private means what ultimately would have to be done at public expense, and that public justice calls for a broad and tolerant viewpoint in the making of an appraisal such as the present one. See Union & New Haven Trust Co. v. Eaton, D.Conn.1927, 20 F.2d 419, 421; Norris et al. v. Commissioner of Internal Revenue, 7 Cir. 1943, 134 F.2d 796, 801, 149 A.L.R. 1324; United States v. Proprietors of Social Law Library, 1 Cir. 1939, 102 F.2d 481; Gardiner et al. v. Hassett, D.Mass.1945, 63 F.Supp. 853; Duffy v. Birmingham, 8 Cir. 1951, 190 F.2d 738. Numerous other decisions are cited in support of plaintiffs' contention that the term "exclusive" should not be read literally. We agree generally that there should not be a literal reading of the statute and that some noncharitable activity is not inconsistent with its terms if the organization is predominantly charitable. We need not, therefore, discuss all of the cited cases.

The plaintiffs particularly rely on Dulles v. Johnson, 2 Cir., 1959, 273 F.2d 362, 365, and Seasongood v. Commissioner of Internal Revenue, 6 Cir., 1955, 227 F.2d 907. In Dulles the gifts were to New York City and State Bar associations and were made for the purpose of cultivating the science of jurisprudence, promoting reforms in the law, facilitating the administration of justice, elevating the standards of integrity, honor and courtesy in the legal profession, and cherishing the spirit of brotherhood among the members thereof. The Court of Appeals of the Second Circuit held the Bar Association to be organized exclusively for charitable purposes. In doing so the court carefully considered the legislative activity of the Bar Association and held that its efforts in this regard were limited to technical improvements in the statutes rather than broad social objectives. It was on this basis that the court concluded that it was entitled to be treated as an exempt organization. The Court reasoned that legislative work of this kind is public effort which is not condemned by the statute. It said:

"Finally, we must consider those activities which concern or affect legislation, a subject highlighted by the district court and upon which it would appear to have placed considerable emphasis. Through their various committees the Associations study and report on proposed and existing legislation. Often they send copies of their reports and resolutions to the legislative, executive and judicial branches of the federal and state governments. The major portion of this work is of a technical nature involving the adequacy of proposed and existing legislation in terms of its form, clarity of expression and its effect on and relation to other law. The Associations' work has been expressed in expert reports on matters uniquely within the fields of experts and has avoided questions which are outside those fields, i. e., questions which turn largely on economic or political decisions.

"These activities serve no selfish purpose of the legal profession—rather they constitute an expert's effort to improve the law in technical and non-controversial areas. In our opinion these activities are scientific, educational and charitable." 273 F.2d 362, at 367.

In Seasongood the Court of Appeals for the Sixth Circuit reversed the Tax Court, 22 T.C. 671 and held that the Hamilton County Good Government League, formed "to provide an opportunity for discussion of matters of civic importance and to advance good government," was organized exclusively for educational purposes. In that case it was said [referring to the statute]:

" * * * Certainly, it cannot mean that all recommendations addressed to the public, or to legislative or administrative officials, comes within its scope. If so, then all representations or proposals designed to awaken public opinion or inform authority must have in them some quality of evil, since they are in effect condemned in a remedial statute, by excluding their proponents from its benefits, whether they are advanced in the public or private interest. It is my view that, as used in the statute, the term connotes public address with selfish or ulterior purpose and characterized by the coloring or distortion of facts.

\* \* \* \* \*

"If this is the sense in which the term is used in the section herein involved, and I think it is, there is nothing in the findings of fact of the Tax Court which justifies the Commissioner in his determination, that the activities of the League were exerted for a selfish, unethical purpose, or is anywise lacking in good faith. Indeed, the findings and conclusions of the Tax Court negative such purposes. To brand such representations as were made by the League as 'political' does not gainsay this observation." 227 .F.2d 907, at 911.

■ Disagreement was noted regarding the appropriate meaning to be given Congress' use of the word "propaganda", two members of the court refusing to follow the writer's very narrow interpretation. However, the question in the instant case does not involve the definition of "propaganda", nor did it in Seasongood; thus we express no view regarding that controversy. The issue here is whether the non-public activity of the Denver Medical Society formed an incidental part of its total work during the period in question. No question of ulterior, selfish or morally repugnant conduct is involved; nor, in our opinion, is an analysis of motive appropriate. The test is public versus non-public activity; the criterion is an objective, not a subjective, one.

The Seasongood court further concluded that since only five per cent of the group's efforts was devoted to legislative activity, this was relatively insubstantial. The organization was so much different in Seasongood than it is in this case that that opinion is not persuasive here. There the organization was avowedly a political organization in the broad sense. In spite of ·findings that much work went into "investigating proposed legislation and making a study of *necessary* legislation to effect some public purpose," 227 F.2d at 909 [emphasis added], and that some activity was exerted in behalf of candidates for public office, it was deemed a non-partisan organization. Rather the Court found it to be a service group with no special interests to advance, seeking merely to instill tone in government. It may well be that this furnishes a valid basis for differentiating it. Thus it may be possible to argue that the organization can with impunity seek to influence the course of governmental action provided it does not have a special interest at stake. We need not decide that since the Society here is not such an organization.

Finally, the suggestion in Seasongood that five per cent of the organization's activity must be deemed insubstantial for purposes of the statute introduces a questionable approach to the problem. The apparent certainty of a per-cent test obscures the basic difficulties of balanc-

ing activities in the context of organizational objectives and circumstances. For example, the amount of non-public activity arguably "substantial" may well vary between religious groups and labor organizations.

On the other hand, Hammerstein v. Kelley, E.D.Mo.1964, 235 F.Supp. 60, affirmed 8 Cir., 349 F.2d 928, appeals to us as being very much in point. That case involved a bequest to the St. Louis Medical Society of trust income "to be used for library purposes." The trust also provided that the trustee could in his sole discretion terminate the trust and pay over the principal to the St. Louis Medical Society, its successors or assigns. It was because of this provision that the claimed deduction was not permitted. The trial court painstakingly reviewed the evidence and concluded that the deduction was properly disallowed. In affirming this decision, the Eighth Circuit held that there was substantial evidence in support of the finding that the St. Louis Medical Society was not a charity within the meaning of the statute, and further approved the trial court's holding that the power granted the trustee to terminate the trust rendered the gift nondeductible.

The language of Chief Judge Harper in 235 F.Supp. 60, 65, is particularly applicable here:

"There are many other activities of the Society that could be discussed but will only be mentioned here. They serve to show how far afield the Society has gone out of consideration of its members, and they are: a) one annual edition of the Bulletin is devoted to a roster of physicians, pharmacies, hospitals, nurses, etc.; b) the Society aids the physician placement service of the State Association; c) a patient referral service; d) a collection agency for doctor's fees, still in existence, though largely inactive; e) printing business cards, stationery, prescription blanks, etc., for members at cost; f) a telephone answering service for members; g) a Grievance Committee, though with no legal powers or authority, to consider complaints against members; h) a group insurance program; i) publishes advice on tax matters, office management, economic practices and organization; and j) the Society works closely with the Missouri Medical Service which administers the Blue Shield health insurance plan. The Society names representatives to the Service's board of trustees, and devotes much space in the Bulletin and time at its meetings for discussion of the insurance program and policy, and has frequently taken official positions in regard to it."

The Court then concluded:

"Despite the charitable and educational activities of the St. Louis Medical Society admittedly existing, its activities are quite clearly not exclusively within that category, nor are its activities in the legislative sphere non-substantial. The evidence is quite clear that many of its activities, including the political and legislative activities of the Society, prevent it from being a charitable organization within the meaning of Section 2055."

■■ In the case at bar we recognize that the Denver Medical Society has many worthy and qualifying activities. Indeed, counsel for the plaintiffs argue that its activity is so predominantly charitable as to satisfy the exclusive test; or, differently stated, that its noncharitable activities are insignificant and thus insubstantial. We agree that an organization whose noncharitable activities are merely incidental to its charitable objective is entitled to the exemption; however, we must conclude that the noncharitable activities of the Denver Medical Society are not merely incidental, but are substantial. The Society was organized as a professional association and its purposes, as expressed in its charter, show that it was formed

not only to promote the science and art of medicine and the betterment of public health, but also the "unity, harmony, and welfare of the medical profession, and, together with other component societies, to maintain the Colorado Medical Society, and through it the American Medical Association." Thus, it would not be satisfying its original purposes if it were not seeking to promote the welfare of the profession and the welfare of its individual members. Necessarily, much of its activity has taken this form. This is not a condemnation of the Society; it is merely a recognition of its true character. Therefore, when it undertakes to influence government policy at the State and Federal levels so far as it would affect the medical profession, it is doing so in furtherance of the interest of the profession as such and the members of the profession. When it gives support to auxiliary organizations, the object and purpose of which is to influence or effect social policy, it is not carrying on its charitable objectives. So also, when it engages in public relations it is promoting purely professional and individual interests. Moreover, when it engages in a referral service it is at least in part carrying on a noncharitable activity.

Therefore, we must conclude that although the Denver Medical Society has a charitable character, it also has a noncharitable side and its noncharitable aspect is not incidental and insubstantial. It follows that the Society is not organized and operated exclusively for "religious, charitable, scientific, literary, or educational purposes, including the encouragement of art and the prevention of cruelty to children or animals, * *."

It is concluded from a reading of all of the evidence and a consideration of the law of the case, that plaintiffs' claim is without merit and that it must be denied. It is, therefore,

Ordered that judgment be entered in favor of the defendant and against the plaintiffs and the complaint dismissed.