**ST. LOUIS UNION TRUST COMPANY,**
Executor of the Estate of Frank Land-
wehr, Deceased, Appellant,

v.

**UNITED STATES of America,**
Appellee.

No. 18263.

United States Court of Appeals
Eighth Circuit.

March 9, 1967.

428

Forrest M. Hemker, of Greensfelder, Hemker, Wiese, Gale & Chappelow, St. Louis, Mo., for appellant. Davis Haskin, of Thompson, Mitchell, Douglas & Neill, St. Louis, Mo., with him on the brief.

John M. Bray, Atty., Dept. of Justice, Washington, D. C., for appellee. Mitchell Rogovin, Asst. Atty. Gen., and Lee A. Jackson and Melva M. Graney, Attys., Dept. of Justice, Washington, D. C., and Richard D. FitzGibbon, Jr., U. S. Atty., St. Louis, Mo., with him on the brief.

Before VAN OOSTERHOUT, BLACKMUN, and GIBSON, Circuit Judges.

BLACKMUN, Circuit Judge.

We are concerned here with the subjectability to federal estate tax of a

bequest and devise to The Bar Association of St. Louis.

Judge Frank Landwehr, who had been a judge of the Circuit Court of the City of Saint Louis from 1918 to 1936, died testate a resident of that city on May 10, 1959. He was a bachelor. His sister Clara, then age 80, survived him.[1] By his will and codicil the judge bequeathed his law books to the Bar Association of St. Louis and his personal effects and an automobile of her selection to Clara, and gave his residuary estate to the St. Louis Union Trust Company, as trustee. He directed that the trustee

> " * * * shall hold the trust estate for the benefit of my sister, Clara Landwehr, and shall pay over and distribute so much of the net income derived therefrom as the said Trustee shall determine is needed for her comfortable support and maintenance so long as she shall live. Any income not so paid over in each calendar year shall be added to principal."

The trustee was to "continue to hold" the testator's home and its contents

> " * * * so long as my sister, Clara Landwehr, wishes to use it as a home, and said Trustee shall maintain said home and keep it in repair as long as my said sister makes it her home."

There was an invasion-of-principal clause for Clara's benefit.

At Clara's death, or upon her non-occupancy of the home at any time, all the testator's books in the residence were bequeathed to the Bar Association. Also at her death the trustee was to pay Clara's funeral and grave marker expenses and a number of monetary bequests for named relatives and employees. These bequests were conditioned upon survivorship and continuing employment. At the testator's death their possibly effective total was $18,000.

The will then provided,

> "After the death of my said sister, Clara Landwehr, the Trustee shall continue to hold the assets in trust * * * to provide a suitable building and facilities to serve as a headquarters, office and meeting place for the Bar Association of St. Louis and under its control as a meeting place for *all lawyers* and associations of lawyers in the St. Louis area.

> * * * * * *

> "The word 'building' as used herein is used to mean a single building or two or more buildings and shall include such furnishings, equipment and facilities as are necessary or appropriate to the use to be served.

> "In carrying out the purposes of the trust, it is my intention that the Trustee shall have the widest possible latitude and freedom of action to accomplish the purpose, with the funds provided. * * *

> "At such time as the Trustee has completed the carrying out of the purpose of the trust and the building is ready for use and occupancy, the said Trustee shall convey said building to the Bar Association of St. Louis by appropriate deed and conveyance which shall thereafter hold said property for the uses and purposes herein stated, and the Trustee shall be discharged and this trust shall end, except in the case of a surplus of funds as hereinafter provided.

> * * * * * *

> "Should there be a balance of funds remaining after the carrying out of the purpose of said trust, such balance, or should, at the time this trust becomes effective, the Bar Association of St. Louis have an adequate and suitable building, then all of the trust shall continue to be held by the Trustee * * * as a perpetual fund to provide for the upkeep and maintenance of said building. The income only or so much thereof as shall be needed in the opinion of the Trustee shall be paid over to the St. Louis Bar Association yearly or at more frequent intervals for such maintenance, upkeep

---

1. We are advised that Clara Landwehr is now deceased.

or repair. Should there be income in excess of that needed for maintenance, upkeep and repair of the building, the balance shall be used by the Association for general association activities."

The Trust Company was also named as the executor of Judge Landwehr's will and codicil. It so qualified. In the federal estate tax return filed for the decedent's estate, the executor, in determining the taxable estate, asserted as deductions, under § 2055(a) (2) [2] of the Internal Revenue Code of 1954, the returned values, aggregating $415,288.60, of the book bequests and of the residuary gift to the Association. This residuary gift was valued net after allocable death taxes, Clara's interim interest, and the presumably effective legacies payable at her death.

On audit, deductions for these Bar Association gifts were disallowed on the ground that the Association was not an entity of the kind described in § 2055(a).

The estate paid the resulting deficiency. Claims for refund were filed and this suit followed in due course. Approximately $135,000, plus interest, is involved.

Upon the government's demand the case was tried to a jury. The Association called 13 witnesses to testify as to the purpose and nature of the Association and as to its activities. Each was a present or former officer or employee. The government called no witness, but extensively cross-examined the plaintiff's witnesses and offered in evidence a number of documents and publications of the Association. At the close of the evidence each side moved for a directed verdict. The court reserved ruling on these motions and submitted the case to the jury under instructions which made its verdict depend on whether the Association was organized and operated exclusively for charitable, scientific, or educational purposes, thus employing the language of § 2055(a) (2). The jury returned a verdict for the government. The executor's subsequent motion for judgment notwithstanding the verdict or, in the alternative, for a new trial, was denied. It appeals.

At issue are the adequacy of the evidence to support the verdict that the Association did not qualify under the statute; the propriety of the charge; and the effect of the invasion clause.

I. From the language of § 2055(a) (2) it is readily apparent that for a bequest or devise to be deductible four conditions are to be satisfied: (1) the donee corporation must be organized exclusively for religious, charitable, scientific, literary, or educational purposes; (2) the donee corporation must be operated exclusively for those purposes; (3) no part of its net earnings may inure to the benefit of any private individual; and (4) no substantial part of its activities may be the carrying on of propaganda or otherwise attempting to influence legislation.

We note:

1. The government concedes that no part of the net earnings or income of the Association inures to the benefit of any individual. Neither does it argue that deduction is to be disallowed here because any substantial part of the Association's activities consist of carrying on propaganda or otherwise attempting to influence legislation. And the government does not seem seriously to assert that there is any aspect of the Association's formal organization which is disqualifying.

2. "§ 2055. Transfers for public, charitable, and religious uses

 (a) In general.—For purposes of the [federal estate tax] the value of the taxable estate shall be determined by deducting from the value of the gross estate the amount of all bequests, legacies, devises, or transfers * * *

 "(2) to or for the use of any corporation organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes * * * no part of the net earnings of which inures to the benefit of any private stockholder or individual, and no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation * * *."

■ 2. The first, third and fourth conditions of § 2055(a) (2) thus are not in issue. The case comes down to the question whether the Association is, within the words of the statute, "operated exclusively for * * * charitable, scientific * * * or educational purposes". Its activities are the decisive factor.

3. Despite the will's provision that the gift to the Bar Association was one in trust for the acquisition and maintenance of a building (with directions for the use of excess income, if any, for "general association activities"), the parties appear to agree that the gift is to be treated as one to the Association for its general purposes. Consequently, § 2055(a) (3), which allows a deduction for a gift to a trustee to be used exclusively for qualifying purposes, although urged in one of the refund claims and in the complaint, is not now of particular significance in the case.

4. Government counsel, in his argument to the jury, stated that the word "exclusively" in the controlling statute did not mean that an organization "can't engage in anything at all that is not charitable", and that "Many of [the Association's] activities are truly charitable". The trial court's instructions reflected this concept.

Certain established legal principles are applicable:

■ 1. The word "exclusively", as it appears in § 2055(a) (2), is pivotal. Thus, the statute's requirement that the donee corporation be "organized and operated exclusively" for the qualifying purposes demands that all its primary activity be so devoted. Hammerstein v. Kelley, 349 F.2d 928, 930 (8 Cir. 1965). The same is true with respect to exemption from federal income tax, Stevens Bros. Foundation, Inc. v. Commissioner of Internal Revenue, 324 F.2d 633, 638 (8 Cir. 1963), cert. denied 376 U.S. 969, 84 S.Ct. 1135, 12 L.Ed.2d 84; Duffy v. Birmingham, 190 F.2d 738 (8 Cir. 1951), and with respect to exemption from federal social security taxes. Better Business Bureau of Washington v. United

States, 326 U.S. 279, 66 S.Ct. 112, 90 L.Ed. 67 (1945). Like statutory language is used in the income tax deduction and gift tax deduction sections. § 170(c) (2) (B), § 642(c), and § 2522(a) (2) and (b) (2) of the 1954 Code.

The standard is exemplified by the Supreme Court's comment in Better Business Bureau, p. 283 of 326 U.S., p. 115 of 66 S.Ct., a case which pivoted on "organized and operated exclusively for educational purposes":

"In this instance, in order to fall within the claimed exemption, an organization must be devoted to educational purposes exclusively. This plainly means that the presence of a single noneducational purpose, if *substantial* in nature, will destroy the exemption regardless of the number or importance of truly educational purposes." [Emphasis supplied].

Thus, the existence of extensive good works or operations which, by themselves, admittedly would qualify, is not enough if there is a substantial nonqualifying activity.

■ 2. However, the word "exclusively" has not been interpreted to mean "solely" or "absolutely without exception". Instead, activity which is not religious, charitable, scientific, literary or educational will not result in loss of deductibility or of exemption if that activity is only incidental and less than substantial. Dulles v. Johnson, 273 F.2d 362, 368, 80 A.L.R.2d 1338 (2 Cir. 1959), cert. denied 364 U.S. 834, 81 S.Ct. 54, 5 L.Ed.2d 60; Seasongood v. Commissioner of Internal Revenue, 227 F.2d 907, 912 (6 Cir. 1955); Estate of Philip R. Thayer, 24 T.C. 384, 391 (1955); 6 Mertens, Law of Federal Income Taxation, § 34.07 (1957) and 1966 supplement. See Better Business Bureau of Washington v. United States, supra; Trinidad v. Sagrada Orden, 263 U.S. 578, 582, 44 S.Ct. 204, 68 L.Ed. 458 (1924); Stevens Bros. Foundation v. Commissioner of Internal Revenue, supra, pp. 638–639 of 324 F.2d; Krohn v. United States, 246 F.Supp. 341, 346 (D.Colo.1965). Thus, a slight and comparatively unimportant deviation

from the narrow furrow of tax approved activity is not fatal. Government counsel and the district court, as we have noted, both acknowledged this.

■ 3. One stated reason for a deduction or exemption of this kind is that the favored entity performs a public service and benefits the public or relieves it of a burden which otherwise belongs to it. Duffy v. Birmingham, supra, p. 740 of 190 F.2d; Trinidad v. Sagrada Orden, supra, p. 581 of 263 U.S., 44 S.Ct. 204.

■ 4. Whether the Association was organized and operated exclusively for the statutorily designated purposes ordinarily is a fact issue. The jury's determination, therefore, must stand if it has substantial support in the record. Hammerstein v. Kelley, supra, p. 930 of 349 F.2d; Stevens Bros. Foundation, Inc. v. Commissioner of Internal Revenue, supra, p. 638 of 324 F.2d.

■ 5. The burden of proof is on the executor who claims the deduction. Welch v. Helvering, 290 U.S. 111, 115, 54 S.Ct. 8, 78 L.Ed. 212 (1933); Duffy v. Birmingham, supra, p. 740 of 190 F.2d; Haberman Farms, Inc. v. United States, 305 F.2d 787, 790 (8 Cir. 1962).

With these principles in mind we analyze the record. And we emphasize at this point that we detect no real dispute as to the facts. The controversy centers in the application of the statute and of these established legal principles to the facts.

*History and organization.* The Bar Association of St. Louis was chartered in 1874 by pro forma decree of the Circuit Court of the City of Saint Louis, pursuant to Laws of Missouri, Adjourned Session, 23rd General Assembly (1865–66), pp. 69–70, relating to Benevolent, Religious and Educational Associations. (See V.A.M.S. ch. 352, particularly § 352.060). It has thus been in existence for over ninety years. Although subject to favorable action by a committee on admissions, membership is voluntary and is open to any member of the Missouri bar in good standing residing in the City or County of Saint Louis or practicing in Saint Louis. Associate membership is available to lawyers licensed elsewhere in the United States and to fulltime members of a law school faculty. In 1965 there were 2,050 members.

The Association's "Object" is set forth as Article II of its Constitution:

"This Association is established to maintain the honor and dignity of the profession of the law; to cultivate social intercourse among its members; to promote legal science and the administration of justice; to promote and maintain the efficiency and integrity of the Judicial Departments of the Government; to provide and establish organized facilities for the furnishing of legal services to all citizens at a cost within their means; to uphold and defend the Constitution of the United States and maintain representative government; to apply its knowledge and experience in the field of law to the promotion of the public good."

Regular membership meetings are held about four times a year. The Association's activities are directed on a week-to-week basis by an executive committee of eleven members. There is a fulltime executive director. The Association has two formal sections, the Patent, Trademark and Copyright Section and the Junior Bar Section. Nine standing committees are specified by the ByLaws, and twenty others are authorized. In fiscal 1964 there were 44 standing and special committees and over 800 members involved in committee work.

*Activity.* The record discloses a number of areas of activity by the Association. These, we suspect, are typical of any bar group which is lively and civically responsible in these twentieth century days which have witnessed rapidly increasing complexity in the economic and legal aspects of our society.

1. The area of education. Activity here is of two kinds, one directed at lawyers and the other at laymen.

Prominent in the program for lawyers are institutes given twice a year in co-operation with the Law Schools of Washington and St. Louis Universities. Each institute is devoted to a particular legal subject and consists of a weekly lecture for six to eight weeks. The lecturers usually are members of the Association who serve without remuneration, but occasionally experts from fields other than law are retained. Participants pay a registration fee. The lecturers prepare written course materials. Any income received which exceeds expenses is used for future institutes. The subject matter of the institutes reflects to a degree suggestions made by lawyers. Attendance generally runs from 100 to 150. The institutes concern fairly specialized legal subjects. Among the topics have been medical-legal problems, small business, will drafting, legal accounting, estate planning, trial practice, labor law, corporation law, real estate, pleading and proof, administration of decedents' estates, federal income taxation, creditors' rights, family law, the Robinson-Patman Act, settlement of negligence cases, condemnation, deferred compensation and pension plans, public speaking, international law, trial and appellate advocacy, criminal defense work, and the Uniform Commercial Code.

Other activities include speakers at bar luncheon meetings and the publication of The St. Louis Bar Journal, a quarterly periodical containing legal articles of some depth. The Junior Bar Section conducts trial and office practice institutes and has published and distributed handbooks and digests on various subjects.

The Association has also undertaken educational activities in behalf of law students and newly admitted lawyers. It has provided judges for the moot court programs at the local law schools. It has encouraged members to have law students as summer clerks. The Junior Bar Section has conducted an annual program to introduce newly admitted lawyers to some of the practical aspects of law practice and has arranged for law students to assist appointed counsel in the criminal defense of indigents.

Among the activities directed at laymen or the general public has been radio and television programming. The Association has produced or assisted in the production of a number of programs broadcast during time donated by the stations. Some of these have been designed to educate laymen on legal matters. Others have had as their purpose the discussion of a wide variety of public issues of local, national, and international import. Perhaps the most substantial effort in this area has been a weekly live television program called "Close Up", which has been broadcast since 1958 on "public interest" time. For this program the station obtains a government official or leader of public opinion and the Association provides panelists (60% of them lawyers) to interrogate the guest. In seven years there have been 360 programs and the Association has provided over 1,000 panelists.

Another public effort has been a drive to instill in high school students an appreciation for the law and for freedom under law. One aspect was a "Bill of Rights Educational Program" consisting of a series of twelve lectures by law professors and lawyers to 140 social studies teachers in the Saint Louis area on various aspects of the Bill of Rights. St. Louis and Washington Universities agreed to accord the participants graduate credit.

Members of the Association have also addressed high school students directly on the function of law and the legal system. The Junior Bar Section has maintained a speakers' bureau to respond to requests from non-legal groups for speakers on a variety of legal topics. A trial demonstration committee has presented mock trials before interested lay organizations.

The government stresses that there is no "substantial public attendance" at the institutes; that the luncheon meetings are "bread and butter" sessions; that the program for recent graduates is for "bridging the gap" between law school

and law practice; that the bread and butter activities provide members with instruction "in some of the most practical techniques for making a living"; that this saves time for the members; and that while the activity is by its nature educational, it is not exclusively so, for its purpose is commercial benefit as well as improvement of capabilities.

 We are satisfied, however, that these activities alone would not deprive the estate of the claimed deduction. They are basically and obviously educational in nature. Weyl v. Commissioner of Internal Revenue, 48 F.2d 811 (2 Cir. 1931). The government concedes as much although, as indicated, it intimates that the activities have a huckster aspect. That lay participation in some of these activities is not very great, or is even absent, and that education of this kind results in increased professional capacity for the lawyer students or in increased professional stature and repute for the lawyer participants, do not transform the activities into something other than educational pursuits within the meaning of the statute. Dulles v. Johnson, supra, pp. 367–368 of 273 F.2d; United States v. Proprietors of Social Law Library, 102 F.2d 481, 483–484 (1 Cir. 1939); Estate of Elizabeth L. Audenried, 26 T.C. 120, 127 (1956).

2. The area of legal assistance. Another major activity centers in the Association's attempts to extend the advantages of legal assistance to those whom it may benefit but who, by reason of indigence, ignorance, fear, or suspicion, do not otherwise obtain it. One aspect of this work consists of investigation, research, and recommendations with respect to providing legal aid in civil cases to the indigent. In Saint Louis there are a municipally operated Legal Aid Bureau and a private legal aid society. The Association has concerned itself with what it has regarded as the limitations of the former and has been instrumental in creating and affording leadership and financial aid to the latter.

The Association has also operated a Lawyers Reference Service since 1940. Until 1949 this work was handled on a voluntary basis from members' private offices. Since then, the Service has been housed initially at the Association's headquarters but more recently in the Civil Courts Building. A lawyer pays $10 a year to be a member of the reference panel. The Service office is open five hours a day. It is in charge of a salaried attorney who is assisted by three lawyers serving parttime for $5 an hour. A person seeking legal assistance pays a registration fee of $1 for an interview. This fee is sometimes waived. A majority of the registrants are not referred to a lawyer, either because it is discovered that they have no real legal problems, or because their problems can be solved or their questions answered by the interviewer. The remaining matters are referred to lawyers on the panel. The referral lawyer is to charge no more than $3 for one-half hour or $5 for a longer time for the first interview. The fee for further service is subject to agreement between the lawyer and the client. On occasion, a referral proves to be financially worthwhile for the lawyer. In this connection, it is to be noted that the legal aid offices in Saint Louis do not handle domestic problems, divorces, child support, adoptions, or bankruptcies, and usually do not institute suit, and that often persons who go to legal aid are not sufficiently indigent to qualify for its services or are not city residents.

There are 200 to 250 lawyers on the referral panel. It is not necessary that a lawyer be a member of the Association in order to join the panel. The panelists are not all novices; over 80% have practiced more than five years and are over thirty years of age. The Association makes no profit from the reference service; in the fiscal years 1964 and 1965 expenses exceeded fees collected from panelists and registrants. During the five-year period from 1960–65 over 16,000 persons were interviewed. The Service also distributes to its registrants, and others upon request, pamphlets which describe the cost of legal work,

the services lawyers perform and the occasions on which they may be useful, the manner in which to choose an attorney, legally protected rights, and the like. About 37,000 of these pamphlets have been distributed annually.

The government asserts that all this is an ethical means of getting at a large amount of "untapped legal business"; that it is a mechanism by which lawyers get paying clients sent to them; that lawyers are willing to pay for this, not for charitable but for business reasons; and that, while there is a "clear public benefit involved in these services", they are really a benefit to lawyers and thus are not exclusively charitable.

 We feel, on the contrary, that all this is basically and genuinely charitable, within the meaning and reach of § 2055 (a) (2). Here, again, there well may be incidental benefit flowing on occasion to a lawyer on the referral panel. This, however, is but a minimal consequence of broad public service performed in what is essentially an eleemosynary endeavor. By this means, persons with real or imaginary legal problems, who otherwise, for one reason or another, would not seek or obtain legal help find assistance and answers. It is hardly a great untapped source of profitable legal business. We think the government overemphasizes the incidental economic benefits and unjustifiably would taint with an accusation of commercialism legal activity which is dedicated to the public good.

This same argument was advanced by the government in Dulles v. Johnson, supra, and was there peremptorily dismissed by the Second Circuit with the flat statement that such activities were charitable. Pp. 367–368 of 273 F.2d. We agree.

3. The area of improvement of the law and of the administration of justice. The Association has broadly sought to achieve improvements in the administration of justice and in various aspects of procedural and substantive law. This has been accomplished through research,

investigation, drafting, and recommendation and endorsement of various reforms. For example, the Association afforded assistance in drafting the well-known Missouri Non-Partisan Court Plan, adopted in 1940. Since 1956 it has proposed amendments to the Missouri Probate Code. It has done research, drafting and lobbying in connection with the adoption of the Missouri Administrative Procedure Act. It has rendered assistance in the development of a proposed new city charter for Saint Louis. It has studied and advised the mayor on bail bond procedures. It has studied parole and probation procedures at the request of the Circuit Court. It has undertaken an extensive study and investigation into the efficiency and honesty of judges and constables attached to the magistrate's court, and has sponsored and opposed various legislative proposals relating thereto. It has drafted and sponsored legislation with respect to adoption and juveniles. It has assisted in developing new marriage counseling procedures in Saint Louis. It has sought to encourage the retirement of superannuated judges and to defend members of the judiciary who have been subjected unjustly to public attack. It has worked for the retention of judges who cannot campaign on their own behalf under the court plan. It has held enrollment ceremonies for newly admitted members of the bar and has urged them to become members of the Association and to participate in the public service aspects of professional life. It has requested the Tax Court of the United States to schedule its field sessions in Saint Louis at specified times of the year so as better to serve the trial convenience of counsel. And, at the request of the Circuit Court, it has investigated and suggested improvements in that court's docket system.

 We readily conclude that all this activity in this area is clearly charitable, within the meaning of the statute. It is directed and devoted to improvement of the law and of the administration of justice. Much of this very kind of thing is embraced in the Missouri Supreme

Court's Rule 4 enunciating Canons of Ethics, V.A.M.R. This is public, not private, betterment. This is not propaganda or disqualifying legislative activity of the type referred to in § 2055(a)(2). This general area was one of the pivotal issues in Dulles v. Johnson, supra. We agree with the Second Circuit's positive evaluation thereof as scientific, educational and charitable at p. 367 of 273 F.2d.

4. The area of unauthorized practice and professional discipline. It is a misdemeanor to engage in the unlicensed practice of law in Missouri. V.A.M.S. § 484.020(2). Although the Association is not vested with responsibility or authority for bringing suit to punish or enjoin unauthorized practice, it maintains a committee working in this area. This committee receives complaints from lawyers, judges, and the public. It requests accused individuals to appear before it and usually is able to induce them to cease activities found to be improper. On occasion it has participated in litigation to enjoin continued impropriety. See, for example, State ex inf. Miller v. St. Louis Union Trust Co., 335 Mo. 845, 74 S.W.2d 348 (1934).

The Association also has a Committee on Grievances to which the public may submit complaints relating to the conduct of lawyers. The chairman submits each complaint to a member who investigates and reports back to the committee. The accused may be asked to appear. If the committee feels a breach of professional ethics has occurred, it refers the matter to the executive committee. The Association, however, has no responsibility for enforcing professional discipline. This is a function of the integrated state bar, Rule 5 of the Rules of the Supreme Court of Missouri, V.A.M.R., but charges may be preferred by any member of the bar in good standing. V.A.M.S. § 484.200. The Association has joined in disbarment proceedings. See In re Richards, 333 Mo. 907, 63 S.W.2d 672 (1933). It is within the power of the Association to expel its own members for professional impropriety.

The Association maintains a Committee on Professional Ethics to render opinions on ethical problems submitted to it by members of the bar.

Here again the government acknowledges that there is much public interest and public benefit in this area. It suggests, however, that activity of this kind is mainly a matter of public relations and of projecting an appropriate image of the lawyer, his place and his work.

■ We disagree and conclude that this activity as to unauthorized practice and internal discipline is one primarily and substantially imbued and indeed infected with a public purpose. Of course, a profession's image and its relations with the public will be enhanced when it demonstrates ethics, effective discipline, and the protection of the public from invasion externally by incompetent and illtrained persons and from imposition internally by the rascals of the profession. But this is an incident and a result rather than a basic characteristic of the endeavor.

Both these factors were also under challenge in Dulles v. Johnson, supra. Although, under New York law, bar associations possess statutory powers with respect to unauthorized practice and professional discipline which are not bestowed by Missouri law, what the Second Circuit said there, pp. 365–366 of 273 F.2d, is pertinent here:

"We cannot say that this program [regulation of unauthorized practice] does not benefit the public or that it does not serve charitable and educational purposes. * * * If these activities were not undertaken by the Associations, the cost of this necessary regulation would descend upon the public. Hence we conclude that as to regulation of the unauthorized practice of law the Associations must be deemed 'charitable.' * * * [T]he district court misconceived the purpose of these activities [discipline and grievance]. Lawyers play a unique and important role in our society. In its dealings with lawyers the public

must often act on faith. It is the function of bar associations to see that this faith is not misplaced. * * * While increased public esteem for lawyers may result in material advantage to members of the legal profession, the true benefit from a disciplined and socially responsive bar accrues directly to the public."

See, also, Rhode Island Hospital Trust Co. v. United States, 159 F.Supp. 204 (D.R.I.1958), where a bequest to be used, among other things, "for the prosecution and punishment of those members [of the bar] who violate their obligations to the court and to the public", was held to be a gift for charitable purposes, within the meaning of § 812(d) of the 1939 Code, corresponding to § 2055 of the 1954 Code. As Dean Pound said, "The public has, a deep interest in having a well organized bar part of the machinery of administering justice in a complex social and economic order". The Lawyer From Antiquity to Modern Times, p. 11, (1953).

5. The area of professional convenience, economics and social activities. In a number of ways the Bar Association has concerned itself somewhat with matters which bear upon the convenience or economic well-being of its members. It has a committee on the economics of the bar. This committee has discussed the utilization of a minimum fee schedule but none has been adopted. Suggested promotion for an "annual legal check-up" has been voted down. The Association has also been interested in the economics of running an efficient law office; in a proposal to pay lawyers in the armed forces on a basis comparable to those of doctors and dentists; and in the Jenkins-Keogh bill to allow self-employed individuals to have income tax deductions for amounts set aside under retirement plans. It has also studied incorporation as a possible tax savings device for lawyers; sponsored a lawyer placement service; and arranged for the availability to members of group hospital and life insurance coverage.

The Association and its Junior Bar Section have sponsored social activities. There have been, annually, a Christmas party, a golf tournament, a membership dinner, and a night at the Municipal Opera. It has promoted foreign travel by the membership. The Junior Bar Section has a schedule of periodic dinners, parties, and dances, and for a short time it sponsored monthly cocktail parties.

Perhaps the Association's major social activity—and it obviously has cast a long shadow over this particular litigation—is the dining and lounge facility adjacent to its new headquarters at the Mayfair Hotel in Saint Louis. Prior to November 1960 the Association's headquarters consisted of four "rather small rooms" in a building in downtown Saint Louis. They were barely adequate to house the office, the Lawyers Reference Service, equipment and supplies. It was not possible to hold committee meetings there. A five-year search for new space culminated in May 1959, when the Association authorized the execution of a lease of 4,000 square feet on the eighteenth floor of the Mayfair Hotel and the borrowing of $70,000 to finish and furnish the facility. The total investment in the leasehold improvements was $100,000. The Association moved to its new headquarters November 1, 1960. The lease is for a term of ten years and is renewable for two five-year periods at the option of the Association. Rental for the first five years was $7200 per year and for the second five years $9600. The lessor has title to all furniture and fixtures placed on the premises. There are, however, provisions for partial refund of the Association's investment in the event of termination of the lease for certain causes during the term or in the event of non-renewal.

One-fourth of the space so leased is used for offices of the Association's executive director and his secretaries. Committee meetings are held in that space. An additional 400 square feet was subsequently leased for administrative needs. The remaining 3,000 square feet consists of dining and lounge facil-

ities open six days a week. These, however, are operated and staffed by the Mayfair Hotel and not by the Association. The Mayfair, under the lease, has "the sole and exclusive right" to furnish that service. The menu is the same as that in the hotel's main dining room. Prices are comparable except for the addition of a 15% service charge. Although the Association guarantees payment within 60 days of members' bills incurred at the facility, it has not been called upon to honor this commitment except occasionally when a member has died.

The $70,000 loan to finish and furnish the Mayfair quarters is the largest single financial transaction in the history of the Association. Dues were increased $12 a year to amortize this indebtedness. In the material it submitted in competition for the American Bar Association's 1961 Award of Merit the Association listed three activities as representing the "major emphasis" of its program. The first was "The opening of new headquarters, offices, lounge and restaurant, elegantly furnished, in penthouse space atop the Mayfair Hotel in downtown St. Louis".

One witness testified that the opening of the Mayfair facility was a response to agitation among members "to have a place to meet with clients, where lawyers could be found at noontime, and at which young lawyers and trial lawyers * * * could eat and get back to court on time". Membership increased by more than a third in the years between the opening of these facilities and the time of trial. In its application for the Award of Merit the Association noted that opening the new facility had produced a great number of new membership applications, "many from lawyers who had never cared about Bar Associations before"; that previously inactive members "began to strut a little"; that morale and spirit rose; and that committee meetings held in the new headquarters were well attended. There was also testimony that administrative efficiency had increased and that lawyers had been encouraged to join the Association and to take interest in its work.

 Apart from the Mayfair facility, we would have no trouble whatsoever in flatly holding that the matters of professional economics and convenience and the social activities hereinabove described are, as the Second Circuit described similar things in Dulles v. Johnson, supra, p. 368 of 273 F.2d, "merely auxiliary to the charitable and educational purposes we have discussed". We dismiss them accordingly.

Deserving additional comment, however, is the Mayfair facility. The government gives great emphasis to this, describes it as "a cocktail lounge and dining room operating as a luncheon club available only to dues paying Bar Association members and their guests", and claims that it is a "substantial" activity and thus disqualifying for estate tax purposes. It particularly stresses that in the Award of Merit application the Association described the opening of the new headquarters and its financing as a "really substantial program".

The Association, of course, disagrees. It denies that the facility is in any true sense a lawyers' club. It emphasizes that the Mayfair Hotel operates the dining room and lounge. It takes the position that the facility is a necessary adjunct to headquarters and an incidental one to Bar Association activity. It serves to bring the members together. No income at all is realized by the Association from the food and drink.

We agree with the Association. We are impressed with the meagerness and insufficiency of the facilities possessed by the Association for the years prior to 1960 and with the continuing and growing need for adequate quarters. The Association is a sizable one. It merits and requires ample and satisfying offices, committee and meeting rooms, and space for equipment and supplies. Its hopes for increased membership and increased bar activity were readily realized upon the completion and use of the new Mayfair area. The rent paid is concededly reasonable. The Association neither

conducts the dining and lounge facility nor reaps direct financial benefit therefrom. Those services and that reward are supplied and retained by the lessor-hotel and are not functions of the Association. The situation is not dissimilar to a hospital's eating facility and seems to us to equate with the hotel's making available for lawyers, when they are on the premises, eating and lounge supplies from its own stock and kitchens. All this smacks of the incidental and not of the substantial.

We have cited Dulles v. Johnson, supra, a number of times as precedential authority here. The government would contrastingly distinguish Dulles because, it says, "certain activities" of the New York Associations there were submitted to the trial court by written stipulation. Consequently, it is argued, the Second Circuit's reversal of the trial court's decision in that case is consistent with the rule that an appellate court may decide such a case equally as well as the district court and is not to be limited by the latter's findings of fact; that the reversal in Dulles "nowhere suggested that the issue is one of law"; that if this verdict is to be overturned, "all bar associations must be declared charities as a matter of law"; that the Dulles case dealt essentially with only four major activities; and that no important issue was made as to any of these in the present case.

We have already noted the areas in which Dulles v. Johnson stands as precedent here. Further, we have been supplied with and have examined the lengthy primary stipulation filed in Dulles. This naturally is revealing and discloses much more detail than could practicably be included in the appellate opinion. We are struck with the similarity of the New York Bar Associations' activities in the fields of lawyer referral service, lawyer placement, continuing legal education, public relations, publications, bar buildings (one being largely rented to lawyer tenants), unauthorized practice, and entertainment (cocktail party, an annual spring party, dramatic and motion picture presentations, an orchestra of law-

yer members, and a mid-summer golf meeting with the presentation of prizes) to those of the Bar Association of St. Louis. In many respects the New York activities of this type strike us as being of even greater magnitude than those in Saint Louis. Yet they were held to be incidental and auxiliary and not substantial. We regard the Dulles case as factually parallel, as helpful precedent, and as good law and we find ourselves in agreement with the result reached there.

This, then, is a case where, were we the trier of fact, this court would readily conclude that the activities of the Bar Association of St. Louis convincingly demonstrate that it is operated exclusively for charitable, scientific and educational purposes, within the meaning of § 2055(a) (2), and that those activities on its part which are social in nature, or which are otherwise not to be characterized as charitable, scientific or educational, are only incidental and are not substantial.

 It is true, of course, that this court is not the trier of fact. The case was submitted to a jury and that jury returned a verdict for the government. This necessarily places upon the Association a heavy appellate burden. If the evidence were such that a real factual issue were present, and if there were an evidentiary basis for the verdict, it would not be our role to disagree with that verdict. Lavender v. Kurn, 327 U.S. 645, 653, 66 S.Ct. 740, 90 L.Ed. 916 (1946); Hanson v. Ford Motor Co., 278 F.2d 586, 596 (8 Cir. 1960); Security Benefit Life Ins. Co. v. Jackson, 318 F.2d 846, 849 (8 Cir. 1963). But we feel that this is not such a case; that there is a complete absence of probative facts or compelling inferences which support the jury's conclusion; that, with this absence of a fact issue, the case should not have been submitted to the jury; and that the legal conclusion that the Association is operated exclusively for the stated statutory purpose inevitably follows from the facts. The situation, therefore, is not essentially different from that which confronted the Second Circuit in the

*Dulles* case where the district court had found against the bar associations whose bequests were the subject of litigation there.

By no means does our holding necessarily indicate that all bar associations are charities under § 2055(a) (2) or that any particular association at all times would so qualify. Each case must be decided on its own and current facts. It is not difficult to imagine a situation where a bar association has exceeded the limitations of the statute. We hold here only that on the present record the Bar Association of St. Louis has met the statutory standard as a matter of law.

Two of us on the present panel sat on Hammerstein v. Kelley, supra, 349 F.2d 928. We are acutely aware that in that case, decided less than two years ago, we affirmed a district court judgment, also in the Eastern District of Missouri, which denied an estate a deduction under § 2055(a) (2) for a bequest for the benefit of the St. Louis Medical Society. The members of our sister profession may not view too kindly the opposing results which we reach in these two Saint Louis cases. The facts of the cases, however, are different and are of such degree of difference, we feel, as to stand in vivid contrast and to compel opposing results. The distinguishing features of the Medical Society case, particularly evident from Chief Judge Harper's opinion at 235 F.Supp. 60, 63–65 (E.D.Mo.1964), were (1) the substantial limitation of the Society's concern to the welfare of its members "rather than the general good"; (2) its vigorous activity on controversial legislative issues, such as Medicare and social security age, directly affecting the economic aspects of medical practice; (3) political activity to an extent whereby, as Judge Harper described it, pp. 64–65, "the Society has taken steps to virtually become a political action organization"; (4) an extensive and avowed public relations campaign; and (5) an aggregate of other items, including a collection agency, printing at cost of professional cards and stationery, a telephone answering service, close associa-

tion with a health insurance plan, and the like, which the court felt, p. 65, "show how far afield the Society has gone out of consideration for its members". See Krohn v. United States, supra, 246 F. Supp. 341. The difference between the Medical Society case and this one may be only one of degree. That, however, is the basic nature of the issue of substantiality. We feel that the estate here has demonstrated factually and conclusively that the Bar Association's total activity falls on that side of the issue which qualifies it for exemption under the statute, but that the estate in the Medical Society case failed to fulfill that burden.

II. This conclusion makes it unnecessary for us to consider the Association's additional argument that there were errors in the trial court's instructions.

III. This leaves for consideration the tax effect of Clara Landwehr's invasionary interest in the testamentary trust. The government's motion for a directed verdict was in part based on the proposition that the presence of this interest destroyed any deduction otherwise allowable for the Association's residuary gift. The invasion clause reads:

"I hereby authorize the St. Louis Union Trust Company to encroach upon the principal of the trust estate for the proper maintenance and support of my said sister, if this becomes necessary in the opinion of the Trustee, or to provide against any emergency which may arise affecting her occasioned by sickness, accident, ill health, affliction, misfortune or otherwise, and it may make such encroachments from time to time and in such amounts as it may consider reasonable and necessary under the circumstances for the purposes stated."

It was stipulated that Clara was born January 24, 1879, and was 80 years of age at the Judge's death; that her life expectancy was then approximately five years; that she had been living with her brother at his residence; that her living habits after the Judge's death were substantially the same as they had been for years before; that her annual expendi-

tures for support and maintenance, including the costs of domestic employees and medical expenses, from the death of the Judge through 1962 averaged $9,307 per year; that she owned apartment property having a fair market value of $99,500; that from this property she could expect to receive annual spendable income of at least $6,000; that the fair market value of the trust estate as of April 6, 1965, was $410,996; and that the expected annual income of the trust was $16,830.

From these stipulated facts it is evident that the available spendable income from Clara's personally owned apartment property covered about two-thirds of her average expenses for support and maintenance; that the income from the trust estate, available for her, was itself more than half again the amount of those average expenses; and that the apartment income and the trust income together were more than double the expenses. These are income figures and amounts available prior to any capital invasion.

The applicable law is fairly well developed. An intervening life estate, without more, does not destroy the deductibility of the value of an otherwise qualifying charitable remainder. United States v. Provident Trust Co., 291 U.S. 272, 54 S.Ct. 389, 78 L.Ed. 793 (1934); Estate Tax Regulations, § 20.2055-2(a). But where the life estate is accompanied by a power of invasion of the corpus on behalf of the life beneficiary, the situation becomes complicated. When the extent of that invasion is limited and the value of the remainder is "presently ascertainable" and severable, and the possibility of invasion is remote, the deduction is available. Merchants Nat'l Bank of Boston v. Commissioner of Internal Revenue, 320 U.S. 256, 260–261, 64 S.Ct. 108, 88 L.Ed. 35 (1943); Ithaca Trust Co. v. United States, 279 U.S. 151, 154, 49 S.Ct. 291, 73 L.Ed. 647 (1929); Estate Tax Regulations, § 20.2055-2(b); Rev.Rul. 54–285, 1954–2 C.B. 302.

Examples of deductibility are Ithaca Trust Co. v. United States, supra ("nec-essary to suitably maintain her in as much comfort as she now enjoys"); Lincoln Rochester Trust Co. v. McGowan, 217 F.2d 287 (2 Cir. 1954) ("necessary to meet any unusual demands, emergencies, requirements or expenses for her personal needs that may arise from time to time"); Commissioner of Internal Revenue v. Wells Fargo Bank & Union Trust Co., 145 F.2d 130 (9 Cir. 1944) ("on account of any sickness, accident, want or other emergency"); Estate of Oliver Lee, 28 T.C. 1259 (1957), acq. 1958–2 C.B. 6 ("emergency, illness or necessity"); Hugh McK. Jones, 29 T.C. 200 (1957), acq. 1958–1 C.B. 5 ("for their proper maintenance, education and support, in accordance with the standard of living to which they have been accustomed, or to provide against any emergency which may arise affecting them occasioned by sickness, accident, ill health, misfortune or otherwise").

The contrary result ensues where there is no such ascertainable or "ready standard", or where there is general uncertainty. Merchants Nat'l Bank of Boston v. Commissioner of Internal Revenue, supra; Henslee v. Union Planters Nat'l Bank, 335 U.S. 595, 69 S.Ct. 290, 93 L.Ed. 259 (1949); Humes v. United States, 276 U.S. 487, 48 S.Ct. 347, 72 L.Ed. 667 (1928); Commissioner of Internal Revenue v. Estate of Sternberger, 348 U.S. 187, 75 S.Ct. 229, 99 L.Ed. 246 (1955); Mississippi Valley Trust Co. v. Commissioner of Internal Revenue, 72 F.2d 197 (8 Cir. 1934), cert. denied 293 U.S. 604, 55 S.Ct. 119, 79 L.Ed. 695. Thus deductibility has been denied in Merchants Nat'l Bank of Boston v. Commissioner of Internal Revenue, supra, ("comfort, support, maintenance, and/or happiness", the trustee's discretion to be exercised "with liberality to my said wife, and consider her welfare, comfort and happiness prior to claims of residuary beneficiaries"); Henslee v. Union Planters Nat'l Bank, supra, ("pleasure, comfort and welfare of my mother" and "in such manner as she may desire"); DeCastro's Estate v. Commis-

sioner of Internal Revenue, 155 F.2d 254 (2 Cir. 1946), cert. denied 329 U.S. 727, 67 S.Ct. 82, 91 L.Ed. 630 (sums as, in the trustee's discretion, "will amply provide" for the widow's needs, with no one having "the right to call in question the propriety or the amount so applied"); Marine Trust Co. of Western New York v. United States, 247 F.Supp. 278 (W.D. N.Y.1965) ("sickness, accident, misfortune or any other circumstances * * * or for any other reason"); Commerce Trust Co. v. United States, 167 F.Supp. 643 (W.D.Mo.1958) ("illness, injury, or under any circumstances of emergency affecting her welfare or health"); In re Bartlett's Estate, 153 F.Supp. 674 (E.D.Pa.1957) ("any sums as my Trustees, in their sole discretion, may consider to be for the best interest of" the beneficiary "during illness or emergency of any kind").

Although the line of distinction between certain of these cases may appear to be faint, some of this is perhaps attributable to the chronology of decision and to initial unsureness about a support standard seemingly placed at rest by Rev.Rul. 54–285, supra.

The language of Judge Landwehr's invasion clause and the stipulated facts would seem to provide assurance that the clause does not destroy deductibility. The government, however, focuses on the words, "in the opinion of the Trustee", "any emergency" for sickness and the like, and "or otherwise". It is argued that all this grants "such an unlimited and subjective power to exercise discretion to invade the corpus that the value of the remainder is rendered incalculable and nondeductible".

We disagree. We conclude that this testator's invasion clause does invoke an ascertainable standard; that the words of "emergency" and "or otherwise" relate only to sickness, accident, and the like; that this is further demonstrated by the limitation imposed upon the trustee that any invasion be "reasonable and necessary"; that this is also fortified by the fact that even the income provision for Clara's benefit during her lifetime is limited to such income as "is needed for her comfortable support and maintenance", with any balance to be added to principal; that the case clearly falls within the line of decisions dominated by Ithaca Trust Co. v. United States, supra; that it is not an example of the more open type of invasion clause held to be fatal in Merchants Nat'l Bank of Boston v. Commissioner of Internal Revenue, supra, and in Henslee v. Union Planters Nat'l Bank, supra; that *Ithaca Trust Co.* is unimpeached by the subsequent opinions in *Merchants Nat'l Bank* and in *Henslee*: that the acquiescence of the Commissioner of Internal Revenue in *Hugh McK. Jones*, supra, is significant; that the government's own Rev. Rul. 54–285, supra, has pertinent application; and that the possibility of invasion is remote. We hold that the invasion clause is not disqualifying.

Reversed and remanded with directions to enter judgment for the plaintiff. The parties indicated at the trial that, in the event of a result favorable to the plaintiff, they would submit an agreed computation as to the amount of an appropriate judgment. We assume that this assistance to the trial court is still available and will be forthcoming.