**ESTATE of Harry A. HAVERLAH, Deceased, Harry L. Brown, Executor, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

Civ. A. No. 5102.

United States District Court, E. D. Texas, Tyler Division.

April 26, 1971.

Allen E. Pye, J. Robert Dobbs, Jr., Tyler, Tex., for plaintiff.

Ben A. Douglas, Department of Justice, Tax Division, Fort Worth, Tex., Roby Hadden, U. S. Atty., Tyler, Tex., for defendant.

## FINDINGS OF FACT

STEGER, District Judge.

1. Plaintiff Harry L. Brown is the duly qualified and acting Executor of the Estate of Harry A. Haverlah, who died December 4, 1964, testate, while a resident of Palestine, Anderson County, Texas.

2. On or about May 18, 1967, plaintiff filed an estate tax return for the Estate of Harry A. Haverlah with the District Director of Internal Revenue, Dallas, Texas.

3. On or about December 19, 1969, following audit of the estate tax return for the Estate of Harry A. Haverlah, a deficiency in estate tax in the amount of $122,692.78 was assessed, together with interest in the amount of $27,807.-56, for a total of $150,500.34. The amount so assessed was paid by plaintiff on or about December 30, 1969.

4. Following assessment and payment of the foregoing amounts, plaintiff filed a claim for refund with the District Director of Internal Revenue, Dallas, Texas, which claim was denied by letter dated January 21, 1970.

5. On April 16, 1970, the Internal Revenue Service, by statutory notice of deficiency, proposed an additional deficiency in estate tax of $26,573.55 against plaintiff. On May 22, 1970, plaintiff paid such proposed deficiency, together with interest thereon in the amount of $6,687.07.

6. Following timely assessment and payment of the deficiency referred to in paragraph 5, *supra*, plaintiff filed an amended claim for refund in which refund of such deficiency was sought, and thereafter, incorporated its amended claim for refund into this action by the filing of its First Amendment to the Complaint.

7. At the date of the decedent's death, he had a gross estate valued at $869,865.28 of which $770,013 consisted of capital stock of the Franklin Life Insurance Company. The remainder of his estate consisted of other stocks, including 147 shares of capital stock of H. L. Brown & Associates, Inc., real estate, cash, insurance and other miscellaneous property.

8. At the time of his death, the decedent was single, his wife having died approximately three months before his death.

9. Decedent left a Will, dated November 16, 1964, in which he named Harry L. Brown Independent Executor and Trustee, and the Trustee was empowered to make all or any part of decedent's estate available to H. L. Brown & As-

sociates, Inc., a corporation of which Harry L. Brown was president (and until his death the plaintiff had been vice president), or any successor corporation of which Harry L. Brown was president, as collateral for loans to that corporation. Also, the Trustee was empowered to make direct loans of the decedent's estate to H. L. Brown & Associates, Inc., or a successor corporation as above described.

10. The Will further provided that if H. L. Brown & Associates, Inc. is given the use of all or any portion of the decedent's estate for purposes of collateral, that corporation was to pay fees to the estate in the manner set out in the Will. If direct loans are made to H. L. Brown & Associates, Inc., such loans must be made on the same or substantially the same terms as those then in existence between H. L. Brown & Associates, Inc. and other lending institutions except that the loans did not have to be secured.

11. In paragraph V. D. of decedent's Will, it is provided that:

"D. The Trustee is directed to pay over to Shirley Johnson, for and during her lifetime or until she shall marry, as the same are collected, all cash dividends paid on my Franklin Life Insurance Company stock.

"Further, the Trustee shall pay over to Shirley Johnson, for and during her lifetime or until she shall marry, as the same are collected, any and all fees paid to the Trustee by H. L. Brown & Associates, Inc. or any successor corporation for its use of any portion of the corpus of the trust estate as collateral; and in the event during any month no such fee is paid by H. L. Brown & Associates, Inc. or any successor corporation, or in the event during any month such fee is less than $450.00, the Trustee is directed to pay over to the said Shirley Johnson a sum of money equal to the difference between $450.00 and the fee actually paid to the Trustee by H. L. Brown & Associates, Inc. or any successor corporation. Such sum shall be paid first out of any undistributed

income then in the hands of the Trustee, but if there be no undistributed income or if it be insufficient in amount to assure such regular monthly payment to Shirley Johnson of $450.00, then I authorize and direct the Trustee to pay such sum to the said Shirley Johnson out of the corpus of the trust estate.

"In addition to the other provisions of this subparagraph D hereof, for and during the lifetime of Shirley Johnson or until she shall marry, my Trustee is authorized, empowered and directed to * * * pay out of any accumulated undistributed income of the trust estate, or if such undistributed *income be insufficient therefor*, the Trustee is authorized to sell the corpus of the trust estate to the extent necessary and to pay from the proceeds of such sale, all costs, expenses and charges for any unusual medical services and all costs and expenses for unusual care and maintenance, including but not limited to the fees and charges of doctors, surgeons, nurses, laboratory fees, hospitals and clinics, incurred by Shirley Johnson, or incurred by either Gary Johnson or Cliff Johnson at any time while the one of said boys incurring the same shall be less than 21 years of age and in the legal custody of Shirley Johnson; and further, the Trustee is authorized, empowered and directed in behalf of the said Shirley Johnson to pay the reasonable costs and expenses of any unusual emergency of a character other than that related to health or medical care. With reference to this emergency provision for additional benefits for the said Shirley Johnson, the Trustee may in his sole discretion determine that the condition called to his attention by Shirley Johnson is unusual and of an emergency nature, in which case he shall forthwith make payments therefor as herein provided; but in the event the Trustee declines to deem such condition unusual or of an emergency na-

ture when the same is called to his attention by the said Shirley Johnson, and the said Shirley Johnson believes the judgment of the Trustee thereon to be in error, then and in such event the determination of the matter as to whether or not such condition is 'unusual' or of an 'emergency' nature shall be made by the Board of Directors of H. L. Brown & Associates, Inc. or any successor corporation, to the end that a decision thereon made by the majority of such Board of Directors shall be conclusive on the issue and binding on both the Trustee and the said Shirley Johnson; * * *.

"Upon the death of Shirley Johnson, or upon her marriage, whichever shall occur first, the provisions of this subparagraph D shall be of no further force and effect, and all benefits to which Shirley Johnson would have otherwise been entitled shall be held and used by the Trustee in accordance with the other provisions hereof. The provisions of this subparagraph D, which inure to the benefit of Shirley Johnson, are calculated to extend to her support and financial aid in excess of what she might be able to earn, and I was moved to place the limitation of 'marriage' upon her right to receive benefits hereunder with the thought that in the event of her marriage her need for support from my estate would not be imperative. Accordingly, I have provided that her marriage will terminate further benefits hereunder * * *."

12. The Trustee was directed to pay out of other income of the trust or, if that be insufficient, then out of the corpus, for the benefit of Gary Johnson, Cliff Johnson and Harry L. Brown, Jr., any and all fees and costs for tuition, room, board, books and other reasonably necessary expenses of a college education, including a reasonable monthly allowance during each month of such college or university attendance not to exceed $50 per month for each of such boys.

13. Decedent's bequest to charity is in paragraph V. F. as follows:

" \* \* \* I direct the Trustee to use all of the income of the trust estate, as well as any of the corpus thereof which he in his sole discretion deems unnecessary to the accomplishment of the preceding purposes, for the establishment and maintenance of a foundation to be known as the 'Harry A. Haverlah Foundation', the principal purpose of which shall be the making of loans to deserving high school graduates who have completed their prescribed course with an average of 'B' or better. \* \* \* "

Paragraph VII of decedent's Will states:

" \* \* \* it is my paramount and primary desire that ultimately my estate will become the basis for an expanding service to educational aid and other benevolent purposes through the foundation hereinabove mentioned, \* \* \*."

14. In June, 1960, the decedent and Harry L. Brown formed a Texas corporation called H. L. Brown & Associates, Incorporated, with principal offices to be in Palestine, Texas, the business of which corporation was to be factoring of accounts receivable. The stock of the corporation was owned 49% by decedent and 51% by Harry L. Brown and his wife.

15. The factoring business of H. L. Brown & Associates, Inc. consisted of purchasing accounts receivables of manufacturers, such as furniture manufacturers, at a discount. The said business required a substantial amount of cash on hand and it was believed that the combination of the decedent making available his Franklin Life Insurance Company stock as collateral for borrowings by H. L. Brown & Associates, Inc. and Harry L. Brown's experience in the credit field would cause the corporation to prosper.

16. Up to the time of formation of H. L. Brown & Associates, Inc., Harry L. Brown had spent 10 years in the business of extending credit under circumstances similar to the business which the corporation was engaged in. The decedent had great confidence in Harry L. Brown, which he showed in a very tangible way by putting up his Franklin Life Insurance Company stock as collateral for loans of H. L. Brown & Associates, Inc., which in March, 1964, reached $480,000 and which amounted to $450,000 at the decedent's death. These loans were made through the East Texas National Bank, Palestine, Texas, with the bulk of the money being furnished by the Bank of the Southwest, Houston, Texas, which participated in said loans to H. L. Brown & Associates, Inc.

17. H. L. Brown & Associates, Inc. has prospered, as is reflected by the following:

| Year | Corporate Net Profit | Corporate Net Worth |
|---|---|---|
| FYE 5–31–62 | $19,893.78 | $ 29,352.43 |
| FYE 5–31–63 | 8,181.20 | 35,419.67 |
| FYE 5–31–64 | 24,059.38 | 52,766.08 |
| FYE 5–31–65 | ( 385.20) | 52,723.47 |
| FYE 5–31–66 | 23,770.81 | 80,837.99 |
| FYE 5–31–67 | 32,767.33 | 104,886.16 |

18. As is indicated in his Will, the decedent had great confidence in the future of H. L. Brown & Associates, Inc. as to its profitability and the increase in value of his interest therein. Up to the time of his death the decedent had profited in four ways from his Franklin Life Insurance Company stock and his interest in H. L. Brown & Associates, Inc.: (1) decedent received cash dividends and stock dividends on the Franklin Life stock; (2) the market value of the Franklin Life stock had continuously increased; (3) he received a salary from H. L. Brown & Associates, Inc.; and (4) the market value of his H. L. Brown & Associates, Inc. stock continuously increased.

19. At the date of decedent's death, the loans of H. L. Brown & Associates, Inc. which the decedent's Franklin Life stock collateralized could have been paid off from the assets of the corporation and it could have been reasonably an-

ticipated that there would be assets of the corporation left over thereafter. There was no real possibility that the decedent's Franklin Life stock would be required to be used to satisfy the obligation of the corporation which it secured.

20. At the date of the decedent's death there was no known reason why the continued use of the decedent's Franklin Life stock as collateral for H. L. Brown & Associates, Inc. loans would in any way jeopardize the value thereof to the trust estate, and there were no other known hazards which would jeopardize the value of the decedent's estate to the beneficiaries thereof.

21. At the date of decedent's death, Shirley Johnson was nearly 35 years of age, was in good health and had no known mental or physical health problems. She was a practicing anesthetist, earning in excess of $10,000 per year. Her two sons, Cliff and Gary were 13 and 12 years of age, respectively, in good health, with no known mental or physical health problems. Mrs. Johnson owned her own home, though there was a purchase money obligation still due thereon which she was paying on a monthly basis and she and her two sons lived in modest comfort.

22. At the time of decedent's death, and for several years prior thereto, Shirley Johnson had maintained a Blue Cross health insurance policy covering herself and her sons and had never experienced a serious illness nor incurred any unusual expenses for medical services or for care and maintenance, nor was there any reason to believe that she would in the future experience any unusual emergency which would require the Trustee to use other accumulated undistributed income of the trust estate or corpus of the trust estate within the provisions of the Will authorizing same for her benefit. The decedent was simply providing for the bare, remote possibility that some such emergency might occur.

23. The income potential of an estate the size of decedent's estate at the time of his death was calculated to produce substantially more than the approximately $10,000 per year which the decedent actually intended for Shirley Johnson to have out of income of his estate, and the accumulation of such additional income from which excess distributions could be made on behalf of Shirley Johnson and her sons was such as to make the possibility of invasion of the corpus of the trust estate for their benefit so remote as to be negligible.

24. Moreover, at the date of decedent's death, the income potential of his estate was such that the possibility that it would be necessary to invade the corpus of the trust estate to pay the educational expenses of Gary Johnson, Cliff Johnson and Harry L. Brown, Jr. was so remote as to be negligible.

25. The interest which charity was to receive from the decedent's estate was presently ascertainable at the date of decedent's death and the plaintiff is entitled to a charitable bequest deduction of not less than the amount claimed on its estate tax return as adjusted to reflect date of death values.

26. Also, plaintiff is entitled to additional deductions for court costs, administration expenses; attorneys' fees and other expenses related to the ultimate determination of estate and inheritance tax liability.

27. To the extent that any of the foregoing findings of fact may be deemed to be conclusions of law, the same shall be so treated.

## PROPOSED CONCLUSIONS OF LAW

1. This is a civil action for refund of estate taxes and interest of $183,760.-96, and this Court has jurisdiction under § 1346(a) .(1) of Title 28, U.S.C.

2. Under section 2055 of the Internal Revenue Code of 1954 (as effective on December 4, 1964, the date of decedent's death) and the Treasury Regulations thereunder, a deduction for Federal estate tax purposes is allowed for the amount of all bequests, legacies, devises or transfers to a Trustee if such con-

tributions or gifts are to be used by such Trustee exclusively for religious, charitable, scientific, literary or education purposes, provided that no substantial part of the activities of such Trustee is carrying on propaganda or otherwise attempting to influence legislation and such Trustee does not participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of any candidate for public office.

■ 3. Under the Will of the decedent in this case, the bequest to the Trustee named therein qualified for deduction under section 2055 of the Code because a present interest in the decedent's estate vested in the Trustee to be used for educational purposes. While the Will made provision for income to be paid to noncharitable beneficiaries, the value of the interest of the noncharitable beneficiaries was ascertainable at the date of the decedent's death and thus was severable from the charitable interest. Treas.Reg. § 20.2055–2 (a); Ithaca Trust Company v. United States, 279 U.S. 151, 49 S.Ct. 291, 73 L.Ed. 647 (1929); Lincoln Rochester Trust Company v. McGowan, 217 F.2d 287 (2nd Cir. 1954); Mercantile-Safe Deposit & Trust Co., Ex'r v. United States, 141 F.Supp. 546 (D.C.Md.1956).

■ 4. The government contends that the discretion given the Trustee in paragraph V. F. of Haverlah's Will is fatal to the plaintiff's claim that a present interest was created in charity by said provision. It has been repeatedly held that broad discretionary powers in a trustee do not destroy a taxpayer's right to a charitable deduction. See, e. g., Bowers v. South Carolina National Bank of Greenville, 228 F.2d 4 (4th Cir. 1955) and C. I. R. v. Est. of Robertson, 141 F.2d 855 (4th Cir. 1944). Moreover, Haverlah's Will plainly directs the Trustee to determine what is needed for for the noncharitable beneficiaries and to use everything else for educational purposes. In this, the Trustee is given no alternative. The evidence disclosed that the Trustee determined that approximately $10,000 per year would be payable to Shirley Johnson and that a maximum of $48,000 would be needed for the education of the three children. The remainder was to be devoted to the educational purposes in accordance with the directions of the Will.

5. In Herron, et al v. Heiner, 24 F.2d 745 (W.D.Pa., 1927), the Testator, among other things, left his residuary estate in trust authorizing the Trustees to use so much of the income as in their discretion they deemed necessary and reasonable for the support and maintenance of a brother and sister of the decedent. Also, the Trustees were to pay $100 per month annuities to several named individuals. The remainder of the trust income was to be devoted to charitable purposes. The estate took a charitable deduction for estate tax purposes of the value of the estate after deducting the sum of the present values of the several annuities payable to relatives and a further sum representing the present value of the bequest to the Trustees for the support of the brother and sister. The amount deducted with respect to the support payments to the brother and sister was based on a monthly amount which the Trustees determined would be sufficient to maintain them both. The Commissioner reduced the charitable deduction on the theory that the discretion of the Trustees as to the amount of income which they might appropriate to the support and maintenance of the brother and sister was unlimited and that they might, therefore, if they saw fit, expend the entire net income from the residuary estate for such purposes. But, the court said that the amount which the Trustees were authorized to expend for the support and maintenance of the brother and sister was limited to that which was reasonable and necessary and that the Trustees' determination of this amount was properly reached and as in the instant case:

"The Trustees in this case are under obligations to pay everything to charity except a limited ascertainable

amount for the maintenance of the two persons. This gift is vested, and covers the excess of the income each year over the needs of the two beneficiaries, which amount is here alone in question."

Thus, since the present interest vested in charity, the charitable deduction should be based on the value of the property less the present value of the annuities which was to be determined under the mortality tables. That is what was done in the instant case.

Similarly, in Estate of Frank Edwin Page, T.C. Memo. 1961–248, 20 T.C.M. 1298, under the Will there involved, the Tax Court found:

"In our opinion the son received a present vested equitable life estate in the residuary trust at the time of Testator's death to the extent of the payment to him of $100 a month out of income, while the charity received a present equitable interest in the balance of the trust and its income subject to the income being diminished in part by reason of the son's contingent rights to additional payments of income upon the occurrence of certain events, and subject further to its being diminished in whole or in part in the discretion of the Trustee, which discretion could be exercised only upon the occurrence of certain contingencies, the probability of which occurrence could not be computed by any actuarial method known to us. Upon this analysis of the facts, it seems to us that the proper method of valuing the charitable bequest is to subtract from the value of the trust corpus the sum of the values of the son's vested life interest in the trust income, his contingent life interests in such income, and his other interests which may be termed his contingent discretionary interest."

Since the son had accepted the sum of $100,000 in commutation of all of his rights (vested, contingent or discretionary) to the trust income, the court found that this was the maximum value of the son's interest in the testamentary trust as of the time of Testator's death.

In Mercantile-Safe Deposit & Trust Company, Ex'r v. United States, 172 F. Supp. 72 (D.C.Md.1959), the decedent by Will left the residue of his estate in trust for the benefit of his sister providing that the Trustee was to pay to the sister only so much of the trust income as the Trustee, in its sole discretion, considering all assets owned by her and all other income, deemed necessary and proper for her reasonable living expenses, comfort, maintenance, and general welfare. Any income not so required was to be accumulated and added to the principal, all of which was to go, upon the sister's death to a university. Due to the amount of the sister's other means, the court found that the possibility that any of the income from the trust would be used for the benefit of the sister was so remote as to be negligible and, accordingly, the Executor was entitled to deduct the entire residuary estate as a charitable bequest.

See, also, Gilfillan, Ex'r v. Kelm, 128 F.Supp. 291 (D.C.Minn.1955).

6. Thus, under the provisions of Haverlah's Will establishing a present interest in charity, the Trustee has no discretion as to whether he must use a portion of the trust estate for charitable purposes because he is directed to do this to the extent that income and corpus of the estate is unnecessary to provide for the noncharitable beneficiaries of the estate. The Trustee was to determine the amount which this would take and he did so by determining that it would take $10,000 of income each year to Shirley Johnson and a total of $48,000 of income for the three children. The present value of said income rights were determined and deducted from the net value of the estate available for beneficiaries as a charitable bequest. The fact that what passed to charity constituted, at least to a substantial extent, a present interest in Haverlah's estate explains why the amount of the charitable bequest was not calculated as if it were a

remainder interest. Accordingly, no deduction has been claimed for the value of the remainder interest which passed to charity under Haverlah's Will.

7. Notwithstanding the foregoing, where the Trustee is empowered to invade corpus for a noncharitable beneficiary, it is well settled that such power must be subject to an ascertainable standard and the possibility that the charitable transfer will not become effective must be "so remote as to be negligible." or, " * * * highly improbable at the time of the decedent's death, * * * " within the meaning of Treas.Reg. § 20.2055–2(b). In connection with the determination of whether an ascertainable standard exists, the charitable remainder cases are most helpful. That the standard of invasion is sufficiently definite and fixed in this case is amply demonstrated by Lincoln Rochester Trust Co., Ex'r (Est. of Harroun) v. McGowan, 217 F.2d 287 (2nd Cir. 1954). The basic principle of the *Lincoln Rochester* case has been endorsed and applied in numerous other cases.

Further examples of ascertainable standards are Commissioner v. Wells Fargo Bank & Union Trust Co., 145 F. 2d 130 (9th Cir. 1944) ("on account of any · sickness, accident, want or other emergency"); St. Louis Union Trust Co., Ex'r v. United States, 374 F.2d 427 (8th Cir. 1967) ("to provide against any emergency which may arise affecting her occasioned by sickness, accident, ill health, affliction, misfortune or otherwise."); Nardi v. United States, 385 F. 2d 343 (7th Cir. 1967) ("because of accident, sickness, or other emergency or unusual condition of any kind * * * [which causes him to] be in need of extra funds."); First National Bank of Akron, Ex'r v. United States, 69–1 USTC ¶ 12,602 (D.C.Ohio 1969) ("accident, illness, other financial emergency of the income beneficiary or to maintain her in the standard of living which she has heretofore enjoyed. It is the intention of the Grantor that this power vested in the Trustee shall be liberally exer-

cised, regardless of the effect which any such invasion or invasions may have been upon the remainderman."). That invasions for emergencies constitutes an ascertainable standard is recognized in Gift Tax Regulations § 25.2511–1(g) (2): "For instance, a power to distribute corpus * * * to meet an emergency would be such a standard." See, also, S. H. Salisbury, Ex'r v. United States, 377 F.2d 700 (2nd Cir. 1967).

8. On the other hand, the standard has been held not to be readily ascertainable in such cases as Merchants National Bank of Boston v. C.I.R., 320 U.S. 256, 64 S.Ct. 108, 88 L.Ed. 35 (1943) ("comfort, support, maintenance and/or happiness," the Trustee's discretion to be exercised with "liberality to my said wife and consider her welfare, comfort and happiness prior to claims of residuary beneficiaries"); Henslee v. Union Planters National Bank, 335 U.S. 595, 69 S.Ct. 290, 93 L.Ed. 259 (1949) ("pleasure, comfort and welfare of my mother" and "in such manner as she may desire"); and Marine Trust Co. v. United States, 247 F.Supp. 278 (W.D. N.Y.1965) ("sickness, accident, misfortune or other circumstances * * * or for any other reason.").

9. It is clear from Haverlah's Will that the emergency invasion of corpus provisions were intended for the purpose of support. On page ten of his Will, Haverlah said:

> "The provisions of this subparagraph D, which inure to the benefit of Shirley Johnson, are calculated to extend to her *support* and financial aid in excess of what she might be able to earn, and I was moved to place the limitation of 'marriage' upon her right to receive benefits hereunder with the thought that in the event of her marriage her need for *support* from my estate would not be imperative." (Emphasis supplied.)

Thus the invasion powers in the instant case clearly fall in line with those cases cited above which found there was an ascertainable standard.

10. It is equally clear that at the date of Haverlah's death, the possibility that the corpus would be invaded was so remote as to be negligible or highly improbable as is required by the Treasury Regulations and case law.

11. In any event, the possibility of invasion for noncharitable purposes, as well as the value of the income interest of Shirley Johnson, Cliff Johnson, Gary Johnson and Harry L. Brown, Jr. has been more than adequately recognized and accounted for on Haverlah's Federal Estate tax return and charity received or will receive not less than the amount claimed thereon.

12. The plaintiff is entitled to a refund of estate taxes and interest of $183,760.96 plus interest according to law, or such larger amount as may be due to additional deductions for court costs, administration expenses, attorneys' fees and other expenses related to the ultimate determination of estate and inheritance tax liability, and judgment should be entered accordingly.

13. To the extent that any of the foregoing conclusions of law is deemed to be a finding of fact, the same shall be so treated.