**VIRGINIA PROFESSIONAL STANDARDS REVIEW FOUNDATION et al., Plaintiffs,**

**v.**

**Michael BLUMENTHAL et al., Defendants.**

**Civ. A. No. 77–1703.**

United States District Court, District of Columbia, Civil Division.

Jan. 24, 1979.

William G. Kopit, Washington, D. C., for plaintiffs.

Donald J. Gavin, Tax Div., U. S. Dept. of Justice, Washington, D. C., for defendants.

## OPINION

HAROLD H. GREENE, District Judge.

This case is before the Court on cross motions for summary judgment and on defendants' motion to exclude certain documents from the record here under review. The sole issue raised by the summary judgment motions is whether the Internal Revenue Service improperly denied the plaintiffs' applications for exemption from federal income taxation pursuant to section 501(c)(3) of the Internal Revenue Code, 26 U.S.C. § 501(c)(3). The pertinent facts are as follows.

### I

Plaintiffs in this action, Virginia Professional Standards Review Foundation (hereinafter generally referred to as "Virginia") and Shenandoah Professional Standards Review Foundation (hereinafter generally referred to as "Shenandoah"), are non-profit corporations organized under the laws of the Commonwealth of Virginia. Broadly stated, plaintiff Shenandoah's corporate purpose is to establish and perform the services of a professional standards review organization (PSRO) pursuant to Title XI of the Social Security Act, 42 U.S.C. § 1320c et seq. (Supp. V 1975).[1] Similarly, plaintiff Virginia was organized for the purpose of assuming responsibilities and duties of a

---

1. Shenandoah's Articles of Incorporation state that it "will serve as the peer review organization for the region designated by the Department of Health, Education and Welfare, as Professional Standards Review Organization Area One of Virginia . . . ;" that it is "organized and operated not for profit, but exclusively for scientific and educational purposes;" and that it has the "following specific objectives . . . to promote the effective, efficient, and economical delivery of health care services in its area, for which payment may be made under the Social Security Act . . . to en-

courage the application of professionally developed norms of care, diagnosis, and treatment in this area . . . to review the professional activities in its area of physicians and other health care practitioners and institutional and non-institutional providers of health care services, payment of which may be made under the Social Security Act . . . to do any and all lawful acts and to engage in any and all lawful activities which may be necessary, useful, or desirable for the furtherance, fostering, or attainment of any or all of the purposes for which the Foundation is organized."

support center for PSROs under the same statutory provisions.[2]

The PSRO program was established by Congress in 1972 pursuant to 42 U.S.C. § 1320c:

[I]n order to promote the effective, efficient, and economical delivery of health care services of proper quality for which payment may be made (in whole or in part) under this chapter and in recognition of the interests of patients, the public, practitioners, and providers in improved health care services, it is the purpose of this part to assure, through the application of suitable procedures of professional standards review, that the services for which payment may be made under this chapter will conform to appropriate professional standards for the provision of health care and that payment for such services will be made—

(1) only when, and to the extent, medically necessary, as determined in the exercise of reasonable limits of professional discretion; and

(2) in the case of services provided by a hospital or other health care facility on an inpatient basis, only when and for such period as such services cannot, consistent with professionally recognized health care standards, effectively be provided on an outpatient basis or more economically in an inpatient health care facility of a different type, as determined

in the exercise of reasonable limits of professional discretion.

The legislative history of the statute indicates that the PSRO programs were created essentially to act in the government's place [3] in ensuring the "effective, efficient and economic" delivery of health care services to Medicare and Medicaid beneficiaries.[4] To accomplish this purpose, PSROs are charged with the responsibility of reviewing health care and recommending the imposition of sanctions against health care practitioners and providers who violate their obligations under the Social Security Act. See 42 U.S.C. § 1320c–9(b). The law also provides PSROs with a number of other functions and responsibilities including the development of regional norms and criteria of diagnosis and care (42 U.S.C. § 1320c–5) in order to foster the reduction of unnecessary medical care.

It is not disputed that both plaintiffs have engaged solely in activities designed to effectuate the purposes of this statutory scheme. In accordance with contracts with the Department of Health, Education, and Welfare, plaintiff Virginia has carried out affirmative education programs for physicians and assisted physician groups to form PSROs. Under such contracts plaintiff Virginia has agreed to be bound by the PSRO Program Manual issued by HEW, which sets forth, *inter alia*, the relevant provisions

---

**2.** The purposes of plaintiff Virginia, as set forth in its Articles of Incorporation, are *inter alia*, "to operate as a private foundation as defined in Section 509 of the Internal Revenue Code exclusively for charitable, educational, scientific, and literary purposes, within the meaning of Section 26–501(c)(3) of the U.S. Code, assuming responsibilities and duties of a support center for professional standards review organizations established, contemplated or planned under Title XI, Part B, of the Social Security Act, as amended, as such support center are authorized by guidelines promulgated under the auspices of the Secretary of the United States Department of Health, Education, and Welfare or to perform similar functions. . . ."

**3.** The Senate Committee on Finance repeatedly indicated that the PSRO's were to perform a quasi-governmental function, stating at one point that: "It is preferable and appropriate that organizations of professionals undertake

review of members of their profession rather than for Government to assume that role. The inquiry of the committee into Medicare and Medicaid indicates that Government is ill-equipped to assure adequate utilization review." S.Rep.No.92–1230, 92d Cong., 2d Sess. at 258 (1972).

**4.** "[A] significant proportion of the health services provided under Medicare and Medicaid are probably not medically necessary. In view of the per diem costs of hospital and nursing facility care, and the costs of medical and surgical procedures, the economic impact of the over-utilization becomes extremely significant. Aside from the economic impact the committee is most concerned about the aged and poor. Unnecessary hospitalization and unnecessary surgery are not consistent with proper health care." S.Rep.No.92–1230, 92d Cong., 2d Sess. at 254 (1972).

and requirements with respect to the organization, purpose, and operation of statewide PSRO support centers. Plaintiff Shenandoah has been designated the conditional PSRO by HEW for Area One in the Commonwealth of Virginia. It performs various specified functions in that capacity, including the development and application of professional norms of care, diagnosis and treatment; and a peer review of professional activities or physicians, other health care practitioners, and institutional and non-institutional providers of health care services, to the extent that payment for these services is made under the Social Security Act. Like its co-plaintiff, plaintiff Shenandoah derives all of its income from HEW contracts, and it, too, has agreed to become bound by relevant provisions of the HEW PSRO Program Manual with respect to its organization, operation, and purposes.

The Internal Revenue Service has denied applications of both plaintiffs for tax exempt status under section 501(c)(3), on the ground that while the organizations were organized and operated for charitable, or exempt purposes, they had a "substantial non-charitable purpose" as well. As to plaintiff Virginia, the IRS hearing officer stated:

> Although designation as a PSRO may enable an organization to provide public benefit beyond that provided by the organization in Rev.Rul. 74–553, the activities of a PSRO also serve a business interest by maintaining the professional standards, prestige, and independence of the organized medical profession. By cooperating to achieve the purposes of the federal statute and taking self-regulation upon themselves, the physicians who make up PSROs are promoting a common business interest by regulating their own profession and preventing the imposition of regulation from the outside. A PSRO thus has a substantial noncharitable purpose to protect the members of the medical profession . . . You, as a PSRO Support Center, differ from a PSRO in that, rather than providing the review activities directly you provide assistance on a statewide level to local PSROs . .

Although there may be charitable and educational aspects to some of your activities and those activities may result in significant public benefit, you are controlled by the organized medical profession and cannot be considered to be operating free from the common business interest of that profession. The benefits that insure to the medical profession from the operation of the PSRO system by the medical profession itself evidence a substantial noncharitable and noneducational purpose to benefit the private interests of that profession.

Similar reasoning was applied to plaintiff Shenandoah's application. The hearing officer emphasized that "by cooperating to achieve the purposes of the statute and taking self-regulation upon themselves, the doctors who make up your organization are preventing regulation from the outside" and concluded that "it is apparent you have a purpose of protecting members of the medical profession."

Plaintiffs' administrative appeals of these decisions were denied on substantially the same grounds and, having exhausted their administrative remedies as required by 26 U.S.C. § 7428, they brought this action pursuant to that statute to obtain a declaratory judgment of their qualification for tax exemption status under section 501(c)(3).

## II

Defendants have moved to exclude from this Court's consideration three affidavits and twelve documents attached to plaintiff's motion for summary judgment. The government contends that these attachments are not properly before the Court inasmuch as they were not part of the administrative record and were never brought to the attention of the IRS. Thus, it is incumbent upon the Court at the outset to determine the proper scope of judicial review.

This Court has declaratory judgment jurisdiction over plaintiff's claim under Ti-

tle 26 U.S.C. § 7428.[5] A review of that statute, its legislative history, and relevant case law leads the Court to conclude that absent good cause the scope of judicial review is limited to the administrative record. The statute expressly requires an exhaustion of administrative remedies prior to judicial action. 26 U.S.C. § 7428(b)(2); cf. S.Rep.No.94–938, 94th Cong., 2d Sess., 585, 590 (1976). Permitting a dissatisfied applicant for tax exemption status to introduce to the Court additional evidence not brought before the IRS would obviously circumvent that requirement. See *Houston Lawyer Referral Service v. Commissioner of Internal Revenue Service*, 69 T.C. 570, 574 (1978); *Southwest Virginia Professional Standards Review Organization v. United States*, Civ. Action No. 77–1691 (D.D.C. October 13, 1978), slip op. at 3–4.

In addition, it is significant that under section 7428 this Court shares jurisdiction over such matters with the U.S. Tax Court and the U.S. Court of Claims. The legislative history of that section indicates that Congress contemplated a "body of national unified precedents," and expected that this Court and the Court of Claims would conform their practice to that of the Tax Court, in view of that tribunal's expertise in such matters. See H.Rep.No.94–658, 94th Cong., 1st Sess., 285 (1975).

The U.S. Tax Court has adopted a rule limiting the scope of judicial review to the administrative record. Rule 217(a) of the Rules of Practice and Procedure of the United States Tax Court provides:

Disposition of an action for declaratory judgment will ordinarily be made on the basis of the administrative record, as defined in Rule 210(b)(3). Only with the permission of the Court, upon good cause shown, will any party be permitted to introduce before the Court any evidence other than that presented before the Internal Revenue Service and contained in the administrative record as so defined.

The Court agrees with the reasoning in *Southwest Virginia Professional Standards Review Organization, supra*, which held, under circumstances analogous to those of the present case,[6] that matters outside the administrative record may not be introduced before the court,[7] and accordingly it will not consider the additional materials proffered by plaintiffs.

### III

■ Plaintiffs seek exemption from federal income taxation under Internal Revenue Code 501(c)(3), 26 U.S.C. § 501(c)(3), which establishes exemption for "corporations . . . organized and operated exclusively for . . . charitable . . . purposes, . . . no part of the net earnings of which inures to the benefit of any private shareholder or individual, no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation, . . . and which does not participate in, or intervene in . . . any political campaign on behalf of any candidate for public office."[8] In order to qualify for exemption

5. That statute provides, in pertinent part, that "in a case of actual controversy involving a determination by the Secretary—(a) with respect to the initial qualification or continuing qualification of an organization as an organization described in Section 501(c)(3) which is exempt from tax under Section 501(a) . . . upon the filing of an appropriate pleading, the United States Tax Court, the United States Court of Claims, or the District Court of the United States for the District of Columbia may make a declaration with respect to such initial qualification . . . ."

6. In that case, plaintiff, a PSRO also organized and operated in Virginia, challenged an IRS determination that it does not qualify for ex-

emption from federal income taxation under 26 U.S.C. § 501(c)(3).

7. It may be that plaintiffs have shown "good cause" within the meaning of Tax Court Rule 217(a), for there was here no administrative record as such or a well-reasoned quasi-judicial agency decision but only a ruling following a conference followed by a letter. However, it is not necessary to reach that issue for it is plain on the administrative record alone that IRS erred.

8. IRS does not contend that plaintiffs' earnings inure to the benefit of private shareholders or that the corporations are engaged in political activity.

under that provision, plaintiffs must establish (1) that they are a "charitable" organization, and (2) that they are organized and operated "exclusively" for charitable purposes.

Plaintiff organizations are clearly "charitable" within the meaning of the statute,[9] and the government so acknowledges. The only issue here is whether plaintiffs are organized and operated "exclusively" for charitable purposes, or whether, as the government contends, these organizations have any "more than insubstantial" non-charitable purposes. In *Better Business Bureau v. United States*, 326 U.S. 279, 283, 66 S.Ct. 112, 90 L.Ed. 67 (1945), the Supreme Court held that an organization cannot meet the Section 501(c)(3) "exclusivity" test if it has any "important" nonexempt purpose. In *St. Louis Union Trust Co. v. United States*, 374 F.2d 427 (C.A.8, 1967), the court explained the section 501(c)(3) "exclusivity" test as excluding an organization from recognition under that section if it has more than a "slight" nonexempt purpose. This principle is reflected in applicable Treasury Regulations with respect both to the organizational and operational tests for exemption under section 501(c)(3). Treas.Reg. § 1.501(c)(3)–1(b)(iii) states that "An organization is not organized exclusively for one or more exempt purposes if its articles expressly empower it to carry on, otherwise than as an insubstantial part of its activities, activities which are not in furtherance of one or more exempt purposes. . . . " Treas.Reg. § 1.501(c)(3)–1(c)(1) provides that an "organization will not be . . . regarded [as 'operated exclusively' for one or more exempt purposes] if more than an insubstantial part of its activities is not in furtherance of an exempt purpose." These standards are applicable here.

If the government's position that plaintiffs have more than insubstantial non-exempt purposes is correct, they cannot quali-fy for exemption status under section 501(c)(3). The Internal Revenue Service contends that plaintiffs have the following not insubstantial non-exempt purposes: (1) their standard-setting and self-regulatory activities prevent the imposition of outside regulation; (2) these activities tend to support the continued viability of Medicaid and Medicare as sources of federal health care payments to the medical profession; (3) medical professionals engaging in these activities receive federal reimbursement for their services; (4) through the operation of PSROs and PSRO support organizations limitations are imposed on the tort liability of affected physicians;[10] and (5) the activities tend to promote public esteem for the medical profession.

## IV

The government asserts that the existence of such purposes is established by a "conclusive common sense inference" that physicians who participate in the PSRO program will benefit financially through such participation and that "for a period of over fifty years the United States Tax Court, the Court of Claims, and the Internal Revenue Service have consistently held that professional organizations in fields as diverse as accountancy, law, architecture, engineering and medicine, which engage in the type of standard-setting and professional self-regulatory activities engaged in or supported by plaintiffs are unable to meet the 'exclusivity' test contained in section 501(c)(3) and in its statutory predecessors." Memorandum In Support of Motion for Summary Judgment, pp. 12–13 (citations omitted).

Certainly one might reasonably assume that the medical profession or many of its members would prefer to be subject to peer review and regulation than "outside" or government review and regulation. It might also be assumed that the medical

---

9. *Eastern Kentucky Welfare Rights Organization v. Simon*, 165 U.S.App.D.C. 239, 506 F.2d 1278 (1974), *rev'd. on other grounds*, 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976); Rev. Rul. 69–545, 1969–2 C.F. 117 (1969).

10. 42 U.S.C. § 1320c–16(c).

profession, or at least some of its members, might prefer to not be reviewed or regulated at all. Yet there is nothing here to suggest that plaintiffs were organized to prevent governmental overview of the medical profession. To the extent that such an intent may be presumed to exist, it must be attributed to the Congress which established the PSRO program, in part at least, to spare the government the difficulties and expense occasioned by government overview, a task better suited for physicians themselves.[11]

■ It is well established that a corporation which provides a community benefit (*Dulles v. Johnson*, 273 F.2d 362 (2d Cir. 1959)) or lessens the burdens of government (*Christian Echoes National Ministry Inc. v. United States*, 470 F.2d 849 (10th Cir. 1972)), may be regarded as engaged in charitable activities, and those activities at a minimum cannot be regarded as bringing an otherwise "charitable" organization as outside the charitable exemption on a substantial non-exempt purpose rationale. The fact is that plaintiffs have done nothing more than to act voluntarily and responsibly to supply the review and regulation contemplated by Congress as necessary for the continued viability of the Medicare and Medicaid programs.

Such financial benefits as physicians and others may derive from the viability of those programs—whether stated in terms of the existence of Medicare and Medicaid, reimbursement for services rendered, or limitation on tort liability—have only a tenuous, incidental, and non-substantial connection with the PSRO scheme. Cf. *St. Louis Union Trust Co. v. United States*, 374 F.2d 427 (8th Cir. 1967).[12] Providers of health care, including physicians, are reimbursed directly by the government for services rendered to Medicare and Medicaid beneficiaries, and participation in the PSRO presumably contributes only to a more systematic and fair evaluation of the costs, quality, and effectiveness of the services rendered measured against standards established by the providers themselves. It would be wholly inconsistent with the congressional purpose to hold that, merely because PSROs make it possible for physicians to function within the framework of various government health programs, the organizations cease to be charitable within the meaning of the tax laws.

Insofar as the esteem of the medical profession may be promoted by the plaintiffs' activities, the Court regards it as a legally non-insubstantial purpose of plaintiff organizations. Charitable or educational activities will almost invariably promote the esteem of members of organizations that engage in such activities. Presumably individuals involved with such well recognized charitable activities such as the United Way, the American Cancer Society, or various church-related activities, gain esteem in the eyes of the community, and it may well be that some of them participate more because of the prestige or esteem they derive from the activity than because they are motivated to assist unfortunates.[13] Yet the charitable nature of such activities is not seriously in question merely because of that intangible benefit.[14]

---

11. The Senate Finance Committee noted in that regard that: ". . . the review process should be based upon the premise that only physicians are, in general, qualified to judge whether services ordered by other physicians are necessary. The committee is aware of increasing instances of criticism directed at the use of . . . Government employees in reviewing the medical necessity of services." S.Rep.No.92–1230, *supra* at 256.

12. The PSRO program was opposed by the organized medical profession. See, *e. g.*, Statement of the American Medical Association on H.R. 1, Hearings before the Senate Committee on Finance, 92d Cong., 2d Sess., Vol. 498, at p.

3242 (1972); see also, *Association of American Physicians and Surgeons v. Weinberger*, 395 F.Supp. 125 (N.D.Ill.1975), *aff'd*, 423 U.S. 975, 96 S.Ct. 388, 46 L.Ed.2d 299 (1976).

13. It is not apparent how a Court, or an administrative body such as the IRS, would go about sorting out such motives.

14. A participant in such activities may even be benefitted, directly or indirectly, on a financial or a professional level by and through such participation.

The government acknowledges (Memorandum, p. 19) that "the terms and legislative history of the PSRO Act make clear Congress' principal purpose in enacting the Act was to ensure the economical and effective delivery of health care services under Medicaid and Medicare." It has not demonstrated that such incidental purposes as exist are more than insubstantial.

## V

The judicial and administrative precedents relied on by the government are not highly persuasive. The various decisions by the Board of Tax Appeals, the Court of Claims, and the Tax Court cited by defendants are of dubious value. Almost all of these decisions were handed down over forty years ago; none of them involved quasi-governmental organizations such as plaintiffs; and all are distinguishable on their facts.[15] As to the cited decisions by the IRS (by way of Revenue Rulings), only two present factual situations sufficiently analogous to the instant case to merit extended discussion.

In Rev.Rul. 74–553, 1974–2 C.B. 168, the Service held that a non-profit organization formed by members of a state medical association to operate peer review boards for the primary purpose of establishing standards of quality, quantity, and reasonableness of costs of medical services, was not entitled to recognition under section 501(c)(3) because

[a]lthough this activity may result in a measurable public benefit, its primary objective is to maintain the professional standards, prestige and independence of the organized medical profession and it thereby furthers the common business interest of the organization's members.

That analysis, however, is inapposite as applied to PSROs in several respects.

The peer review board reviewed in Rev. Rul. 74–553 was formed by a state medical association, and it was governed by a board of directors consisting of the officers of the medical association. Although general membership was open to any physician, voting membership was available only to those officers, and decisions of the board involving fees were not binding on the parties in the dispute. By contrast, PSROs are organizations mandated by federal statute as the exclusive method of assuring appropriate quality and utilization of care provided to Medicare and Medicaid patients. PSRO membership is by law open to all physicians without charge, irrespective of membership in other organizations such as medical societies, and the composition of the board of directors of PSROs may not be tied to any membership or association with any medical society. And PSROs not only have governmental authority to make final decisions regarding quality and utilization for purposes of payment under the Social Security Act, but their decisions are subject to certain due process requirements. See, 42 U.S.C. §§ 1320c–4(a)(5), 1320c–8; PSRO

---

**15.** In *May v. Commissioner*, 1 B.T.A. 1220 (1925), the Board found that a professional organization was not organized exclusively for charitable purposes, inasmuch as its certificate of incorporation indicated, among its purposes, "to unite the accountancy profession . . . to safeguard the interests of public accounts . . . to encourage cordial intercourse among accountants," all of which were incompatible with the relevant statutory requirements for charitable tax exempt status. In *Cook v. Commissioner*, 30 B.T.A. 292 (1934), the Board had virtually no evidence before it as to the purposes or operations of the Association of the Bar of the City of New York, and thus it declined to rule that it was a charitable organization for the purpose of determining the propriety of an individual's deduction from his taxable income of a gift to a special committee within the Association. In *Colonial Trust Co. v. Commissioner*, 19 B.T.A. 174 (1929), the Board found that a medical society had the following purposes: (1) to establish the practice of medicine and surgery in the City of Waterbury upon a respectable footing; (2) the mutual improvement of the members, and (3) promotion of good understanding and harmonious intercourse with each other. The Board stated "these purposes are not such as are made the test of deduction," 19 B.T.A. at 180, citing *George O. May, supra. Montgomery v. United States*, 63 Ct.Cl. 588 (1927), dealt with the Institute of Accountants in the United States of America, an association incorporated in 1917. The Institute engaged in extensive legislative lobbying activities, which the court found was "clearly incompatible with the spirit and purpose of the exempting statute."

Program Manual, Ch. XIX, issued November 10, 1974, by the U.S. Department of Health, Education, and Welfare. PSROs also have specific authority to issue sanction reports regarding providers participating in the program and to notify appropriate licensing authorities concerning such providers. 42 U.S.C. §§ 1320c–9(b)(1), (c).

In Rev.Rul. 77–69, 1977–1 C.B. 143, the IRS granted exemption status under section 501(c)(3) to an organization operated as a Health Systems Agency (HSA) pursuant to the National Health Planning and Resources Development Act of 1974, 42 U.S.C. § 300k et seq.[16] In its ruling, IRS emphasized that HSAs are established in conjunction with recommended national guidelines for health planning policy issued by the Secretary of HEW designed to assure that quality health services will be available at a reasonable cost for all residents in HSA areas; that HSA funding is primarily achieved through federal funds and grants and locally-generated funds not contributed by persons directly interested in support of health resources; and that the governing boards of HSAs must have a majority of consumers, with the remainder being made up of health care providers. No mention is made of the possible financial or public relations benefits that might accrue to health care providers who participate in the HSA program.

It is difficult to reconcile that ruling with the ruling issued in this case. The similarity between HSAs and PSROs and PSRO support centers is obvious. PSROs collect and analyze data, establish regional norms and criteria of care, and coordinate activities with HSAs and other federal and state health planning entities. S.Rep.No.95–393, 95th Cong., 1st Sess., 62, 63 (1977). Both types of organizations were created by Congress to fill voids in the promulgation and development of national health care services and standards. Each, if successful, will promote the esteem of the medical profession, and obviate or minimize the need for government intervention and regulation in their respective areas of concern. There are, to be sure, differences in the membership of the organizations and the type of duties they perform, but these differences have no overwhelming relevance as regards the requirements for tax exemption.

It is not totally without significance in this context that the Department of Health, Education, and Welfare, which is charged with implementation of the PSRO program, has consistently expressed its disagreement with the IRS position. Indeed, a letter dated May 31, 1977, from the Acting Associate Administrator for Health Standards and Quality, to IRS requested "strongly and emphatically" that the Internal Revenue Service reconsider its ruling here.

Case law is likewise unfavorable to defendants. In two significant decisions dealing with the tax exempt status of private bar associations, *Dulles v. Johnson, supra,* and *St. Louis Union Trust Co. v. United States, supra,* U.S. courts of appeals squarely rejected arguments almost identical to those made by defendants here.[17]

---

16. The IRS noted that in meeting their responsibilities under that Act, HSAs were required to carry out, *inter alia,* the following specified functions: gathering and analyzing suitable data; establishing Health Systems Plans (goals) and Annual Implementation Plans (objectives and priorities); providing either technical and/or limited financial assistance to persons seeking to implement provisions of the plans; coordinating activities with Professional Standards Review Organizations and other appropriate planning and regulatory entities; reviewing and approving or disapproving applications for federal funds for health programs within the area.

17. Other cases cited by the parties are of less significance. In *Better Business Bureau, supra,* the Supreme Court found that the Better Business Bureau's "activities [were] largely animated by . . . commercial purpose." The government has not alleged a purpose here nor would the record support such a conclusion. Similarly, in *Contracting Plumbers Cooperative Restoration Corp. v. United States,* 488 F.2d 684 (2d Cir. 1973), the court found that the members of the cooperative derived direct financial benefits from their participation in the organization, which was organized solely to reduce its members' liability for "cuts" made in the streets of New York City during their plumbing activities.

In *Dulles, supra,* the court held that various New York bar associations were organized and operated exclusively for charitable purposes,[18] placing particular emphasis on their performance of regulatory functions, and holding (273 F.2d at 366) that "if these activities were not undertaken by the Associations, the cost of the necessary regulation would fall upon the public."

In *St. Louis Union Trust Co., supra,* the court found that the Bar Association of St. Louis was organized and operated exclusively for charitable purposes although there were a variety of potentially noncharitable activities. For example, the court noted the educational programs run by the Bar, including seminars, lectures, speakers, and publications and stated that (374 F.2d at 434): " . . . education of this kind results in increased professional capacity for the lawyer students or in increased professional stature and repute for the lawyer participants, do not transform the activities into something other than educational pursuits within the meaning of the statute" (citations omitted). The court rejected the government's contention that a lawyer referral service run by the Bar is a means of securing a large amount of "untapped legal business," noting (374 F.2d at 435) that "we think the government overemphasizes the incidental economic benefits and unjustifiably would taint with an accusation of commercialism legal activity which is dedicated to the public good." The court joined the *Dulles* court in emphasizing the public interest effect of the Bar's disciplinary activities, indicating (374 F.2d at 436) that while a "profession's image and its

relations with the public will be enhanced when it demonstrates ethics, effective discipline, and the protection of the public from invasion externally by incompetent and illtrained persons and from imposition internally by the rascals of the profession . . . this is an incident and a result rather than a basic characteristic of the endeavor." [19]

The government makes no serious effort to distinguish these decisions,[20] but it simply maintains that they "were wrongly decided; and the Service has never acquiesced in these decisions" (Memorandum, p. 16).

■ The plain fact is that plaintiffs here meet the standards applied by federal courts—and the IRS itself—in determining whether a charitable organization is operated exclusively for charitable purposes. They engage in no legislative lobbying, political activities, or public relations which might cast doubt on their charitable purposes. The record does not reveal that they have engaged in financial transactions designed to benefit the members of the organizations or the organizations themselves, activities in the nature of a patient-referral service, or other potential money-making activities designed to benefit members or participants. Any benefits which might accrue to participants in the PSRO program are wholly of an incidental nature, and not inconsistent with the charitable purposes and operations of the plaintiff organizations. The plaintiffs' activities are performed in accordance with federal law and are in the public interest.

The Court finds no proper basis for the Internal Revenue Service's denial of plaintiffs' application for tax exemption pursu-

---

18. This conclusion was not affected by the circumstance that the associations had engaged in extensive legislative lobbying to benefit the members of the Bar.

19. The court was troubled by the association's numerous activities in the areas of professional convenience, economics, and social engagements, especially a dining and lounge facility adjacent to its headquarters which represented a $100,000 investment by the association, but it nevertheless concluded that this facility was an incidental adjunct to the Bar Association's activities, not dissimilar to a hospital's eating facility.

20. Defendants also maintain that the *Dulles* and *St. Louis Union Trust* decisions may be criticized as being inconsistent with applicable precedents in their own respective jurisdictions (*Hammerstein v. Kelley,* 349 F.2d 928 (8th Cir. 1965), and *In the Matter of the Association of the Bar of the City of New York v. Lewisohn,* 34 N.Y.2d 143, 356 N.Y.S.2d 555, 313 N.E.2d 30 (1974)) but that contention is not substantially correct. In any event, this Court does not find the reasoning of the earlier decisions persuasive, and to the extent that they are not in accord with *Dulles* and *St. Louis Union Trust,* it declines to follow them.

ant to section 501(c)(3), and it will enter, concomitant with this Opinion, an Order declaring plaintiffs' right to such an exemption.