PROFESSIONAL STANDARDS REVIEW ORGANIZATION OF QUEENS COUNTY, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 9952–77X.    Filed May 8, 1980.

*Robert P. Borsody,* for the petitioner.
*James J. McGovern,* for the respondent.

WILBUR, *Judge:* Respondent determined that petitioner does

not qualify for exemption from Federal income tax under section 501(c)(3).[1] Petitioner challenges respondent's determination and has invoked the jurisdiction of this Court for a declaratory judgment pursuant to section 7428.[2] The issue presented to us is whether petitioner is operated exclusively for charitable purposes within the meaning of section 501(c)(3) of the Code.

## FINDINGS OF FACT

The case was submitted for decision on the stipulated administrative record under Rule 122, Tax Court Rules of Practice and Procedure. The stipulated administrative record is incorporated herein by this reference. The evidentiary facts and representa-

---

[1] All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise noted.

SEC. 501. EXEMPTION FROM TAX ON CORPORATIONS, CERTAIN TRUSTS, ETC.

(a) EXEMPTION FROM TAXATION.—An organization described in subsection (c) or (d) or section 401(a) shall be exempt from taxation under this subtitle unless such exemption is denied under section 502 or 503.

  *       *       *       *       *       *       *

(c) LIST OF EXEMPT ORGANIZATIONS.—The following organizations are referred to in subsection (a):

  *       *       *       *       *       *       *

(3) Corporations, and any community chest, fund, or foundation, organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, or educational purposes, or to foster national or international amateur sports competition (but only if no part of its activities involve the provision of athletic facilities or equipment), or for the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private shareholder or individual, no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation, (except as otherwise provided in subsection (h)), and which does not participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of any candidate for public office.

[2] SEC. 7428. DECLARATORY JUDGMENTS RELATING TO STATUS AND CLASSIFICATION OF ORGANIZATIONS UNDER SECTION 501(c)(3), ETC.

(a) CREATION OF REMEDY.—In a case of actual controversy involving—

  (1) a determination by the Secretary—

  (A) with respect to the initial qualification or continuing qualification of an organization as an organization described in section 501(c)(3) which is exempt from tax under section 501(a) or as an organization described in section 170(c)(2),

  *       *       *       *       *       *       *

upon the filing of an appropriate pleading, the United States Tax Court, the United States Court of Claims, or the district court of the United States for the District of Columbia may make a declaration with respect to such initial qualification or continuing qualification * * *. Any such declaration shall have the force and effect of a decision of the Tax Court or a final judgment or decree of the district court or the Court of Claims, as the case may be, and shall be reviewable as such. * * *

tions contained in the administrative record are assumed to be true for purposes of this proceeding.

Petitioner Professional Standards Review Organization of Queens County, Inc., is a nonprofit corporation formed under New York's Not-for-Profit Corporation Law. Petitioner's offices are located at 112–25 Queens Boulevard, Forest Hills, N.Y. Petitioner has been certified as a professional standards review organization (generally referred to as PSRO) as described in section 249F of the Social Security Amendments of 1972, 42 U.S.C. sec. 1320c (Supp. III 1973). Petitioner's application for exempt status under section 501(c)(3), dated October 28, 1975, was filed with the Brooklyn, N.Y., District Office of the Internal Revenue Service. On June 30, 1977, the Internal Revenue Service issued a final adverse ruling that petitioner is not an organization described in section 501(c)(3).

Petitioner, as a PSRO, is authorized by the Department of Health, Education, and Welfare (HEW) to establish a physician-sponsored organization in its geographic area that will be responsible for certifying the medical necessity of hospital admissions, the appropriateness of the level of care, and the quality of care rendered for all federally subsidized patient care—Medicare, Medicaid and maternal and child health programs.

As stated in the certificate of incorporation:

The purposes for which [petitioner] is to be formed are to promote effective, efficient and economical delivery of health care services of appropriate high quality in recognition of the interests of patients, the public, practitioners and providers in improved health care services with due consideration to cost control, treatment and quality of medical care and educational programs, and to assure through the application of suitable procedures of professional standards review that services be rendered only as and when medically necessary as determined in the exercise of reasonable limits of professional discretion and in the case of services provided by a hospital or other health care facility on an inpatient basis only when and for such period as such services cannot, consistent with professionally recognized health care standards, effectively be provided on an outpatient basis or more economically in an inpatient health care facility of a different type as determined in the exercise of reasonable limits of professional discretion all in furtherance of the objectives sought under Public Law 92–603, Section 249F (b) (Title 42 Section 1320 C U.S.C.A. et seq.), and to function within the County of Queens, State of New York, designated as Professional Standards Review Organization Area 11 pursuant to 42 CFR, Part 101, Subpart A.

Congress authorized PSROs by statute in 1972. Generally,

PSROs are qualified groups of doctors that (1) establish mandatory cost and quality controls in connection with medical treatment rendered in hospitals and financed under Medicare and Medicaid and (2) monitor such care. PSROs were conceived of as part of a larger effort to curb the rising costs of health care and improve health care services.[3]

Petitioner's officers and directors are all doctors of medicine. Members of petitioner, and of all PRSOs, must be licensed practitioners of medicine or osteopathy. If doctor-sponsored program efforts do not succeed, or in the event the physicians in petitioner's PSRO area had not established a PSRO as of January 1, 1978, the Secretary of HEW would be authorized to name some other public or nonprofit agency to set standards and evaluate medical care for Queens County. On May 3, 1976, petitioner, via its interim board of directors, sent membership solicitation letters to prospective members—doctors who perform professional activities in Queens County and who are licensed to practice medicine by the State of New York. The letter generally explained the origin and function of the PSRO program, and pointed out to the prospective members that their membership in the PSRO of Queen's County (petitioner) would mean that:

---

[3]The Senate Finance Committee summarized the necessity of the PSRO program as follows:

"According to recent estimates the costs of the medicare hospital insurance program will overrun the estimates made in 1967, by some $240 billion over a 25-year period. The monthly premium costs for part B of medicare—doctors' bills—rose from a total of $6 monthly per person on July 1, 1966, to $11.60 per person on July 1, 1972. Medicaid costs are also rising at precipitous rates.

"The rapidly increasing costs of these programs are attributable to two factors. One of these is an increase in the unit cost of services such as physicians' visits, surgical procedures, and hospital days. H.R. 1, as reported, contains a number of desirable provisions which the committee believes should help to moderate these unit costs.

"The second factor which is responsible for the increase in the costs of the medicare and medicaid programs is an increase in the number of services provided to beneficiaries. The Committee on Finance has, for several years, focused its attention on methods of assuring proper utilization of these services. That utilization controls are particularly important was extensively revealed in hearings conducted by the subcommittee on medicare and medicaid. Witnesses testified that a significant proportion of the health services provided under medicare and medicaid are probably not medically necessary. In view of the per diem costs of hospital and nursing facility care, and the costs of medical and surgical procedures, the economic impact of this overutilization becomes extremely significant. Aside from the economic impact the committee is most concerned about the effect of overutilization on the health of the aged and the poor. Unnecessary hospitalization and unnecessary surgery are not consistent with proper health care. [S. Rept. 92–1230, to accompany H.R. 1 (Pub. L. 92–603), 92d Cong., 2d Sess. 254 (1972).]"

You will exert a direct influence on setting the standards and criteria for health care review.

Your active participation will help raise the standards of medical care in Queens County.

You will have a direct vote in selecting the leaders of your PSRO.

Enclosed in the letter was a membership questionnaire containing additional information regarding PSROs. This information dealt with subjects including how to organize a PSRO, what recourse doctors have if they oppose the PSRO proposed for their "designated area," what effect PSROs will have on doctors' fees, and how the American Medical Association supports PSROs. In answer to one question regarding benefits doctors would derive from membership in PSROs, the questionnaire noted:

In general, the benefits which may result from membership consist in maintaining professional input to the extent possible in the development and operation of the PSRO and the review it performs in the area, rather than leaving management of the program, after 1977, to some possibly non-professional organization or agency. As in any peer review program, the individual participating physician tends to learn as much from the review process as those reviewed.

The letter also states that the basic principles behind the PSRO program are that:

The quality of patient care should be assured through peer review mechanisms of practicing physicians not by governmental agencies acting without the voice of representative physicians.

Cost containment programs may seriously decrease quality of care if inappropriately administered, and the PSRO amendments of 1972 provide the only opportunity for the medical profession to ensure that such programs do not reduce the quality of care.

Review of the need for hospital admissions, length of stay, medical procedures and patient-care quality should be performed by local physicians on the basis of explicit criteria established by local physicians.

To the extent feasible, the primary functions of PSRO (admissions review, concurrent review of the need for continued care, and medical care evaluation) should be delegated to individual hospitals which are willing and able to perform them.

Improvement in patient care and containment of cost should occur primarily through concurrent admission and review procedures and tailored continuing education programs, rather than through punitive actions such as those which now occur with retrospective denial of reimbursement.

Respondent denied petitioner's application for tax-exempt status under section 501(c)(3) on the ground that more than an

insubstantial part of petitioner's activities is not in furtherance of an exempt purpose. He stated:

> By cooperating to achieve the purposes of the statute [which established PSROs] and taking self-regulation upon themselves, the doctors who make up your organization are preventing regulation from the outside. Although your activities may be of significant benefit to the public, it is apparent that you have a purpose of protecting members of the medical profession. Thus, one significant purpose of your organization is to serve the common business interest of members of the medical profession.

In his final adverse ruling, respondent added:

> your activities also promote, to a substantial extent, the common interests of the medical profession because they minimize public criticism by assuring that physicians and other health care practitioners do not improperly utilize health care resources and facilities. * * *

## OPINION

Petitioner's asserted charitable purpose is to establish and perform the services of a professional standards review organization (PSRO) pursuant to the Social Security Amendments of 1972, ch. 7, tit. 2, sec. 249F(b), 86 Stat. 1430, 42 U.S.C. sec. 1320c et seq. (Supp. V 1972). The PSRO program was established by Congress in 1972 and structured to advance the important congressional policy of ensuring the effective, efficient, and economical delivery of health care services to Medicare and Medicaid beneficiaries. The program was enacted in response to mounting criticism of the method of reviewing the utilization of medical services under Medicare. The Senate Finance Committee summarized the problem as follows:

> The committee has found that present utilization review requirements and activities are not adequate.
>
> Under present law, utilization review by physician staff committees in hospitals and extended care facilities and claims review by medicare carriers and intermediaries are required. These processes have a number of inherent defects. Review activities are not coordinated between medicare and medicaid. Present processes do not provide for an integrated review of all covered institutional and noninstitutional services which a beneficiary may receive. The reviews are not based upon adequately and professionally developed norms of care. *Additionally, there is insufficient professional participation in, and support of, claims review by carriers and intermediaries and consequently there is only limited acceptance of their review activities.* With respect to the quality of care provided, only institutional services are subject to quality control under medicare, and then only indirectly through the application of conditions of participation.

\* \* \* \* \* \* \*

The detailed information which the committee has collected and developed as well as internal reports of the Social Security Administration indicate clearly that utilization review activities have, generally speaking, been of a token nature and ineffective as a curb to unnecessary use of institutional care and services. Utilization review in medicare can be characterized as more form than substance. \* \* \*

\* \* \* \* \* \* \*

Apart from the problems experienced in connection with their determinations of "reasonable" charges, the performance of the carriers responsible for payment for physicians' services under medicare has also varied widely in terms of evaluating the medical necessity and appropriateness of such services. Moreover, ever since medicare began, physicians have expressed resentment that their medical determinations are challenged by insurance company personnel. The committee has concluded that the present system of assuring proper utilization of institutional and physicians' services is basically inadequate. The blame must be shared between failings in the statutory requirements and the willingness and capacity of those responsible for implementing what is required by present law.

[S. Rept. 92–1230, to accompany H.R. 1 (Pub. L. 92–603), 92 Cong., 2d Sess. 255 (1972). Emphasis added.]

Accordingly, Congress authorized the establishment of independent review organizations (PSROs) by means of which practicing physicians would assume responsibility for reviewing the appropriateness and quality of the service provided under Medicare and Medicaid.

The sole issue for our consideration is whether petitioner is operated "exclusively" for charitable purposes, or whether, as respondent contends, petitioner serves a "more than insubstantial" noncharitable purpose, namely, promoting the interest and reputation of physicians.[4]

Section 501(a) provides exemption from Federal income tax for an organization organized and operated exclusively for charitable or educational purposes. The burden of proof is on petitioner to overcome the grounds for denial of the exemption set forth in respondent's notice of determination. Rule 217(c)(2)(i), Tax Court Rules of Practice and Procedure.

Petitioner contends that its activities serve the charitable purposes of promoting community health and lessening the

---

[4]It is undisputed that "exclusively" does not mean "solely." "Exclusively" has been interpreted as requiring that the principal or primary activities must be charitable, and any activities not furthering a charitable purpose must be insubstantial in comparison to the charitable activities. 6 J. Mertens, Law of Federal Income Taxation, sec. 34.07, p. 31 (1975 rev.)

burdens of Government and asserts that any benefits to the medical profession by virtue of its activities are incidental and a natural corollary of performing its exempt functions.

Respondent, citing *Better Business Bureau v. United States,* 326 U.S. 279 (1945), *Baltimore Regional Joint Board Health and Welfare Fund, Amalgamated Clothing & Textile Workers Union v. Commissioner,* 69 T.C. 554 (1978), and similar cases, argues that petitioner serves not only the interests of patients and the public in general but also the interests of medical practitioners and providers.

*Better Business Bureau v. United States, supra,* held that an organization cannot meet the section 501(c)(3) exclusivity test if it has any "important" nonexempt purpose. Similarly, section 1.501(c)(3)–1(c)(1), Income Tax Regs., provides that an organization will not be regarded as operated for one or more exempt purposes *"if more than an insubstantial part* of its activities is not in furtherance of an exempt purpose." (Emphasis added.)

Respondent suggests that petitioner serves several substantial nonexempt purposes including promoting public esteem for the medical profession by lessening public criticism and allowing physicians to set their own standards for the profession, thus preventing outside regulation. Respondent points specifically to petitioner's statements in the membership-solicitation letter sent to doctors in Queens County.

Petitioner cites the recent District Court case of *Virginia Professional Standards Review Foundation v. Blumenthal,* 466 F. Supp. 1164 (D. D.C. 1979), appeal dismissed No. 79–1501 (D.C. Cir., Aug. 13, 1979), which accorded tax-exempt status to a PSRO. On facts essentially the same as those before us therein, the Court, in a thorough and carefully written opinion, squarely rejected the arguments respondent makes herein.

Petitioner also relies on the legislative history relating to the establishment of PSROs to show, generally, that Congress believed the Federal Government to be "ill-equipped to assume adequate utilization review," and that Congress deemed it "preferable and appropriate that organizations of professionals undertake review of members of their profession rather than for Government to assume that role," and that there are no private interests served in petitioner's performance of this service. (S. Rept. 92–1230, to accompany H.R. 1 (Pub. L. 92–603), 92d Cong., 2d Sess. 258 (1972)).

A PSRO's function under Federal law is to foster the reduction of unnecessary medical care and thereby unnecessary expense in the Medicare and Medicaid programs. As the Senate Finance Committee noted:

a significant proportion of the health services provided under medicare and medicaid are probably not medically necessary. In view of the per diem costs of hospital and nursing facility care, and the costs of medical and surgical procedures, the economic impact of this overutilization becomes extremely significant. Aside from the economic impact the committee is most concerned about the effect of overutilization on the health of the aged and the poor. Unnecessary hospitalization and unnecessary surgery are not consistent with proper health care. [S. Rept. 92–1230, *supra* at 254.]

Respondent's argument that petitioner promotes the interests of the medical profession by preventing outside regulation is without merit. We note at the outset that this "self-regulation" was specifically provided for by Congress as the most efficient and effective means of assisting the Government in controlling its costs as the largest purchaser of health care in the United States.[5]

Respondent points, in particular, to the letter which petitioner sent to prospective members, which described the "benefits" which a physician would receive as a member of the Queens County PSRO. It stated, in essence, that a physician's membership in the PSRO would minimize the possibility of outside regulation of the profession.

However, the Senate Finance Committee, in its report on the establishment of PSROs, stressed its hope that physicians would participate in the regulation of their profession via PSROs:

The Committee would stress that physicians—preferably through organizations sponsored by their local associations—should assume responsibility for the professional review activities. Medicine, as a profession, should accept the task of advising the individual physician where his pattern of practice indicates that he is overutilizing hospital or nursing home services, overtreating his patients, or performing unnecessary surgery.

*It is preferable and appropriate that organizations of professionals undertake review of members of their profession rather than for Government to*

---

[5]The regulations accompanying sec. 501(c)(3) define the term "charitable" as including "lessening of the burdens of government." Sec. 1.501(c)(3)–1(d)(2), Income Tax Regs. This concept relates to the provision of governmental or municipal services, either directly, or in tandem with existing Government agencies. Clearly, Congress views PSROs as organizations acting in the public interest by improving the quality of medical care in the United States and by obtaining maximum value for every Federal health dollar expended.

*assume that role.* The inquiry of the committee into medicare and medicaid indicates that Government is ill equipped to assure adequate utilization review. Indeed, in the committee's opinion, Government should not have to review medical determinations unless the medical profession evidences an unwillingness to properly assume the task.

But, the committee does not intend any abdication of public responsibility or accountability in recommending the professional standards review organizations approach. While persuaded that comprehensive review through a unified mechanism is necessary and that it should be done through usage, wherever possible and wherever feasible, of medical organizations, the committee would not preclude other arrangements being made by the Secretary where medical organizations are unwilling or unable to assume the required work or where such organizations function not as an effective professional effort to assure proper utilization and quality of care but rather as a token buffer designed to create an illusion of professional concern.

[S. Rept. 92–1230, *supra* at 258. Emphasis added.]

Read in light of the committee's statement, petitioner's membership solicitation letters appear to us primarily to be encouragement to physicians to participate and not appeals based on any private purposes of the organization. Petitioner's activities of lessening the burdens of the Federal Government and promoting public health far outweigh any incidental benefit that individual physicians, or even the profession as a whole, would derive from petitioner's purposes and activities. *Virginia Professional Standards Review Foundation v. Blumenthal,* 466 F. Supp. 1164 (D. D.C. 1979), appeal dismissed No. 79–1501 (D.C. Cir., Aug. 13, 1979). See also H. Rept. 1860, 75th Cong., 3d Sess. 19 (1939), 1939–1 C.B. (Part 2) 728.

Thus, petitioner has followed the mandate of the Federal Government by voluntarily forming the review organization necessary for the Government to make its Medicare and Medicaid programs cost-effective. In addition, petitioner directly benefits members of the local community who are eligible for benefits under the Medicare and Medicaid programs by improving the quality of health care they receive, and this was also an important goal of Congress in establishing PSROs.

In sum, respondent's claim that petitioner and other PSROs were formed to promote the "interests" of the medical profession is spurious and without foundation. In fact, the PSRO concept was opposed by many in the medical profession, both during the hearings on the 1972 Social Security Amendments and after their enactment. Hearings on H.R. 1 Before the Senate Comm. on Finance, 92d Cong., 2d Sess. 3242, 3252 (1972).

Statement of the Association of American Physicians and Surgeons, *supra* at 2651. See also *Association of American Physicians & Surgeons v. Mathews*, 423 U.S. 975 (1975).

Respondent also contends that petitioner's activities will minimize public criticism and thereby further the "common interests" of the medical profession. On this basis, respondent has characterized petitioner as a professional association under section 501(c)(6) dealing with business leagues.[6]

But, as we have stated and again emphasize for respondent's benefit, petitioner, as a PSRO, is authorized pursuant to Federal law to perform a quasi-governmental function:

the Government has a responsibility to establish mechanisms capable of assuring effective utilization review. Its responsibility is to the millions of persons dependent upon medicare and medicaid, to the taxpayers who bear the burden of billions of dollars in annual program costs, and to the health care system.

In light of the shortcomings outlined above, the committee believes that the critically important utilization review process must be restructured and made more effective through substantially increased professional participation.

The committee believes that the review process should be based upon the premise that only physicians are, in general, qualified to judge whether services ordered by other physicians are necessary. * * * [S. Rept. 92–1230, to accompany H.R. 1 (Pub. L. 92–603), 92d Cong., 2d Sess. 256 (1972).]

Petitioner, mandated by law, is reviewing the utilization of Government-subsidized programs. This activity does not cast it in the realm of a section 501(c)(6) "business league."[7] For these reasons, the precedents relied upon by respondent dealing with professional organizations properly classified as business leagues are inapposite.

Finally, respondent seems to argue that Congress' failure to explicitly classify PSROs as charitable organizations implies some congressional policy in opposition to granting tax-exempt status to PSROs. The most we can say about the absence of any mention by Congress of PSRO's tax-exempt status in the

---

[6]Sec. 1.501(c)(6)–1, Income Tax Regs., provides:

"A business league is an association of persons having some common business interest, the purpose of which is to promote such common interest and not to engage in a regular business of a kind ordinarily carried on for profit. It is an organization of the same general class as a chamber of commerce or board of trade. * * * "

[7]The District Court in *Virginia Professional Standards Review Foundation v. Blumenthal*, 466 F. Supp. 1164 (D. D.C. 1979), appeal dismissed No. 79–1501 (D.C. Cir., Aug. 13, 1979), also distinguished PSROs from business leagues based on PSRO's quasi-governmental functions.

implementing legislation is that Congress apparently did not consider the issue.[8] However, Congress' failure to specifically address this issue at that time does not suggest to us that Congress did not regard PSROs as entitled to exemption under section 501(c)(3) and should not leave petitioner without a judicial remedy in the instant case.

In sum, we find that petitioner promotes and regulates health care services to Medicare and Medicaid beneficiaries under the Government-created PSRO program. We find that although petitioner's activities may incidentally prevent outside regulation of the medical profession, this is part and parcel of the congressional policy underlying the statute.

*Decision will be entered for the petitioner.*

---

[8]Petitioner acknowledges that the House conferees rejected a section contained in the Senate version of the Medicare-Medicaid Anti-Fraud and Abuse Amendments, Pub. L. 95–142, 91 Stat. 1175, which would have granted sec. 501(c)(3) tax-exempt status to PSROs. There was no explanation for this action in the Conference Committee report. By way of explanation, Congressman Rostenkowski, Chairman of the Subcommittee on Health of the House Committee on Ways and Means, made this statement about the conferees' action:

"One issue in particular, the interrelationship of tax policy and health policy, which emerged in the Senate amendment pertaining to the tax treatment of PSROs is a broad subject area that we feel must be examined in significant detail. I have assured Senator Dole [the primary Senate sponsor of the amendment] and the other Senate conferees that the entire impact of the tax code on the financing and delivery of health care is an issue that the Ways and Means Subcommittee on Health hopes to explore during the next session. And I would even take this opportunity to solicit the views of members and others concerned about specific areas appropriate for the committee's review. [19 Cong. Rec. E 6362 (daily ed. Oct. 17, 1977).]"